[No. 50103–3.  En Banc.  May 9, 1985.]

SEA–PAC CO., INC., *Respondent,* v. UNITED FOOD AND COMMERCIAL WORKERS LOCAL UNION 44, ET AL, *Petitioners.*

*Durning, Webster & Lonnquist, James H. Webster,* and *Lynn D. Weir,* for petitioners.

*Oles, Morrison, Rinker, Stanislaw & Ashbaugh,* by *William G. Jeffery, Susan Rae Sampson,* and *Peter B. Camp,* for respondent.

UTTER, J.—A motion for summary judgment brought by Local Union 44 of the United Food and Commercial Workers to obtain dismissal of an action brought by Sea–Pac Company, Inc., was denied by the trial court. We hold as a matter of law summary judgment should have been granted and dismiss the case.

Denial of a motion for summary judgment is generally

not an appealable order, RAP 2.2(a), and discretionary review of such orders is not ordinarily granted. *See Roth v. Bell,* 24 Wn. App. 92, 104, 600 P.2d 602 (1979). It may be granted, however, where "the superior court has committed an obvious error which would render further proceedings useless; . . ." RAP 2.3(b)(1). *Rye v. Seattle Times Co.,* 37 Wn. App. 45, 52, 678 P.2d 1282 (1984). Here, those criteria are met and justice requires review and reversal.

We review material submitted for and against a motion for summary judgment in the light most favorable to the party against whom the motion is made. *Lamon v. McDonnell Douglas Corp.,* 91 Wn.2d 345, 588 P.2d 1346 (1979). The motion is granted only if, from all evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982). A motion to dismiss for failure to state a claim is treated as a motion for summary judgment when matters outside the pleading are presented to and not excluded by the court. CR 12(b). The motion must be denied unless it appears beyond doubt that plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief. *Corrigal v. Ball & Dodd Funeral Home, Inc.,* 89 Wn.2d 959, 577 P.2d 580 (1978).

Sea–Pac Company, Inc., a salmon processing company in Blaine, filed an action against Local Union 44 of the United Food and Commercial Workers, its president, Patrick Finn, and his wife. Although Sea–Pac is not unionized, Local 44 has represented employees at the Dahl Fish Company for a number of years. Mr. Kjell Dahl is president and sole stockholder of several fish processing businesses, including both Sea–Pac and Dahl Fish.

In late 1981 and early 1982, a series of disputes arose between the Union and Dahl Fish. In April 1982, the Union filed a charge with the National Labor Relations Board claiming that Dahl Fish had committed several unfair labor practices. Based upon this charge the Board's regional director issued an unfair labor practice complaint on May 28, 1982. The case was set for hearing before an adminis-

trative law judge (ALJ) to commence September 8, 1982.

On July 16, 1982, the Union received a letter from Dahl Fish Company bringing to light further possible violations of the National Labor Relations Act (the Act) by Dahl Fish. Mr. Finn forwarded the letter to a Board investigator in early August. Board attorneys discussed these new developments with Finn on August 30, 1982. Following those discussions, because of concerns whether the new matters could be litigated based upon the May 28 complaint or would be barred if they could not, on September 2 the Union filed an amended unfair labor practice charge. Upon the filing of this new charge the regional director immediately postponed the September 8, 1982 hearing. An amended complaint issued on November 3, 1982, reflecting the amended charge.

Meanwhile, respondent Sea–Pac commenced the present action against the Union and the Finns in King County Superior Court in November of 1982. In its complaint, Sea–Pac sought damages of $250,000 for alleged intentional interference with business relationships. Sea–Pac's claim, as more fully explained in later pleadings, appears to be that the Union and Mr. Finn deliberately delayed filing an amended unfair labor practice charge to result in postponement of the previously scheduled September 8 hearing at the latest possible moment, knowing and intending that this would disrupt Kjell Dahl's supervision of Sea–Pac's business.

According to Sea–Pac, Dahl annually undertook trips to Europe during August and September to sell its product—salmon. In 1982 Dahl delayed his trip until late September. He made no attempt to have the September 8 hearing set for another date.[1] After postponement of the September

---

[1]At a Board hearing April 19, 1983, Kjell Dahl testified as follows:

"Q. If I understand your testimony, it's the original September 8, 1982 hearing date that interfered with your plans to go to Europe. A. That is very correct, yes. Q. You didn't ask the NLRB to change that date of the hearing, did you? A. I didn't know anything about it. JUDGE WIEDER: Please answer the question. Did you ask the National Labor Relations Board? A. I had no knowledge I could, how

hearing, Dahl left on September 16, 1982, to travel to Europe and begin making sales calls. While Dahl was in Europe, Sea–Pac asserts that the salmon market at home deteriorated resulting in the purchase of fish by Sea–Pac buyers "at an unrealistic price." Sea–Pac seeks to hold the Union responsible for both its loss of European sales and for Dahl's absence from the country when salmon were being purchased.

In September 1983, following some discovery and an unsuccessful attempt by the Union to remove the case to the United States District Court, the Union and the Finns moved for summary judgment of dismissal. The trial judge rejected the motion. Soon afterwards the ALJ found that Dahl and his companies had committed a number of unfair labor practices, including those activities which formed the basis for the Union's September 2, 1982 amended charge.[2] On March 15, 1984, this court deferred deciding the Union's motion for direct discretionary review until the trial judge had an opportunity to review the ALJ's decision.

Four days later, Sea–Pac filed an amended complaint adding to its original complaint a second cause of action for abuse of process. The Union filed a renewed motion for summary judgment seeking dismissal of both causes of action which was again denied.

The Union states four reasons its motion for dismissal should have been granted as to the tortious interference claim: (1) the Plaintiff's Amended Complaint for Damages fails to state a claim for relief; (2) the tort claims are contrary to the public policy of the state; (3) federal labor law preempts the state tort claims; and (4) the Union's petitioning conduct is protected by the First Amendment. Some of the same reasons could support dismissal of the abuse of process claim.

---

else can I answer it." Clerk's Papers app., at 66.

[2]Sea–Pac and Dahl Fish were also found to be a single integrated business enterprise and a single employer for purposes of assessing the conduct complained of under the Act.

■■ We first address the tortious interference claim. The tort of interference with a business expectancy requires (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage. *Calbom v. Knudtzon,* 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964). The plaintiff must show that the future opportunities and profits are a reasonable expectation and not based on merely wishful thinking. *Caruso v. Local 690, Int'l Bhd. of Teamsters,* 33 Wn. App. 201, 653 P.2d 638 (1982), *rev'd on other grounds,* 100 Wn.2d 343, 670 P.2d 240 (1983).

Sea–Pac's theory seems to be that the Union deliberately waited to notify the NLRB of its potential new charges so that, if the Board decided to take action, the September 8, 1982 hearing would be postponed at the last minute. They argue that had the Union acted more promptly, the September 8 hearing might have been postponed early enough for Dahl to travel to Europe at his usual time and return home in time to oversee salmon purchasing by the Sea–Pac plant.

There is no sufficiently close, actual, causal connection between the Union's filing of the amended charge and Sea–Pac's alleged loss. If Dahl could not anticipate change in the salmon market before leaving for Europe, how could any Union officials have foreseen problems as early as July? At worst, deliberate delay by the Union could be responsible only for personal inconvenience to Dahl.[3] Although causation usually is an issue for the jury, *Petersen v. State,* 100 Wn.2d 421, 671 P.2d 230 (1983), "[w]here inferences from the facts are remote or unreasonable, as here, factual causation is not established as a matter of law." *Walters v.*

---

[3]At a deposition, Dahl was asked why he didn't communicate with his buyers by phone while he was in Europe. Dahl responded: "Well, you're looking at a different phone system. Number one, it can take you anywhere from three minutes to eight hours to get a phone call through . . ." Clerk's Papers app., at 60.

*Hampton,* 14 Wn. App. 548, 556, 543 P.2d 648 (1975). Had the hearing been held on September 8 as scheduled, Dahl still would not have been able to leave for Europe at the time he preferred. Were he not in Europe, it is purely speculative that he would have prevented the alleged loss. The cause of Sea–Pac's harm was that the hearing was originally scheduled for September 8, not that it was postponed.

Because we grant summary judgment on this ground, we need not determine whether the other grounds would also support dismissal of the tortious interference with business claim.

■ For the tort of abuse of process, "the crucial inquiry is whether the judicial system's process, made available to insure the presence of the defendant or his property in court, has been misused to achieve another, inappropriate end." *Gem Trading Co. v. Cudahy Corp.,* 92 Wn.2d 956, 963 n.2, 603 P.2d 828 (1979).

In *Fite v. Lee,* 11 Wn. App. 21, 27, 521 P.2d 964 (1974), the court characterized the "essential elements" as

(1) the existence of an ulterior purpose—to accomplish an object not within the proper scope of the process—and (2) an act in the use of legal process not proper in the regular prosecution of the proceedings.

Similarly, the Restatement describes the tort as follows:

One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.

Restatement (Second) of Torts § 682, at 474 (1977).

An element which is implicit in both of these definitions is that the defendant must have employed some "process," in the technical sense of the term. As the Court of Appeals has noted, "[t]he mere institution of a legal proceeding even with a malicious motive does not constitute an abuse of process." *Fite v. Lee, supra* at 27–28. "Thus, there must be an act after filing suit using legal process empowered by that suit to accomplish an end not within the purview of the suit." *Batten v. Abrams,* 28 Wn. App. 737, 748, 626

P.2d 984 (1981).

Here, no process issued in Washington courts; therefore there is no abuse of process. Whether the Union used the process of the Board for an improper purpose is for the Board to decide.

The trial court is reversed and petitioners are granted summary judgment.

DOLLIVER, C.J., and BRACHTENBACH, DORE, PEARSON, ANDERSEN, CALLOW, and DURHAM, JJ., concur.