[No. 67050-6-I.   Division One.   January 14, 2013.]

OUTSOURCE SERVICES MANAGEMENT, LLC, *Respondent*, v.
NOOKSACK BUSINESS CORPORATION, *Appellant*.

800

801

802

*Averil B. Rothrock, Richard G. Birinyi*, and *Connie Sue M. Martin* (of *Schwabe Williamson & Wyatt PC*), for appellant.

*David S. Keenan* and *Lori L. Phillips* (of *Orrick Herrington & Sutcliffe LLP*), for respondent.

¶1 Cox, J. — This is a breach of contract action by Outsource Services Management LLC (OSM) against Nooksack Business Corporation (NBC), a tribal corporation of the Nooksack Indian Tribe.[1] The Whatcom County Superior Court denied NBC's omnibus motion to dismiss based on CR 12(b)(1), (2), and (6).

¶2 Because NBC expressly waived its sovereign immunity in this action on contract, we hold that the superior court has subject matter jurisdiction of this case. Moreover, the loan and other agreements between these parties are not "management contracts," which are void and unenforceable under the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721. Accordingly, the superior court has personal jurisdiction over NBC. Finally, NBC has not

---

[1] We adopt the naming conventions of the parties.

met its burden to show that OSM has "fail[ed] to state a claim upon which relief can be granted."[2] We affirm.

¶3 The material facts are not in dispute. NBC is a tribally chartered corporation of the Nooksack Tribe. NBC operates the Nooksack River Casino in Deming, Whatcom County, Washington. The casino is within the boundaries of the Nooksack Reservation.

¶4 In December 2006, NBC obtained a loan of $15,315,856 from BankFirst, a bank located in South Dakota. The loan agreement and other documents evidencing the transaction are dated December 21, 2006. The loan proceeds were used to retire a $8,129,694 construction loan, pay for the $1,895,019 purchase of refurbished gaming equipment for the casino, and finance improvements to the casino building.

¶5 The loan is a limited recourse obligation of NBC, enforceable against certain security that NBC pledged to the bank. The security includes all of the gaming equipment in the casino and certain proceeds from gaming at the casino. The loan agreement contained an explicit waiver of sovereign immunity.

¶6 In January 2009, NBC failed to make a monthly payment then due under the terms of the loan agreement. BankFirst declared that failure an event of default. But it did not immediately enforce its rights under the loan and other agreements.

¶7 Instead, NBC, BankFirst, and the Nooksack Tribe executed the first of three successive forbearance agreements, the first of which is dated January 30, 2009. After execution of the first forbearance agreement by the parties, BankFirst was placed in receivership by the Federal Depository Insurance Corporation. Thereafter, OSM succeeded to the interest of BankFirst. NBC, OSM, and the Nooksack Tribe executed the next two forbearance agreements.

---

[2] CR 12(b)(6).

¶8 Under the forbearance agreements, NBC acknowledged that it was in default under the terms of the loan agreement. It again expressly waived its sovereign immunity from suit. BankFirst and, later, OSM agreed to forbear exercising the lender's rights under the loan agreement, subject to certain terms and conditions. NBC failed to make the payments required under each of the forbearance agreements.

¶9 In February 2011, OSM commenced this action against NBC for breach of the loan agreement. NBC moved for dismissal of all claims under CR 12(b)(1), (b)(2), and (b)(6). NBC argued that the superior court lacked subject matter and personal jurisdiction to hear the claim. NBC also claimed that OSM failed to state a claim upon which relief could be granted.

¶10 The trial court denied NBC's motion. In its amended written order on the motion, the court also certified its order for interlocutory review under CR 54(b) and stayed this action, pending resolution of any appeal.

¶11 NBC's timely amended notice of appeal followed.[3]

## STANDARD OF REVIEW

¶12 A CR 12(b)(1) motion to dismiss challenges the court's subject matter jurisdiction over the case. When a Washington court rule is substantially similar to a present Federal Rule of Civil Procedure (FRCP), we may look to the interpretation of these federal rules for guidance.[4] We do so here.

¶13 A challenge to FRCP 12(b)(1) may be either facial or factual.[5] In the former case, the sufficiency of the

---

[3] RAP 2.2(d).

[4] *Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 218-19, 829 P.2d 1099 (1992).

[5] 2 James Wm. Moore, Moore's Federal Practice § 12.30[4], at 12-45 (3d ed. 2012).

pleadings is at issue.[6] In the latter, the trial court must weigh evidence to resolve disputed jurisdictional facts.[7] Once challenged, the party asserting subject matter jurisdiction bears the burden of proof on its existence.[8]

¶14 Where a court dismisses an FRCP 12(b)(1) motion "based on a factual challenge . . . the appellate court will accept the factual determination that underpins the decision unless it is clearly erroneous."[9] But, "[w]hen the court [denies] a facial challenge, based on the complaint alone or the complaint supplemented by undisputed facts gleaned from the record, the existence of subject matter jurisdiction is a question of law that the appellate court reviews de novo."[10]

¶15 An FRCP 12(b)(2) motion to dismiss challenges a court's personal jurisdiction. The trial court, in making its determination as to the existence of personal jurisdiction, has discretion to rely on written submissions, or it may hold a full evidentiary hearing.[11] Once challenged, the party asserting personal jurisdiction bears the burden of proof to establish its existence.[12]

¶16 If the trial court has ruled on personal jurisdiction based on the pleadings and the undisputed facts before it, its determination is a question of law that this court reviews de novo.[13]

¶17 An FRCP 12(b)(6) motion to dismiss claims the opposing party has failed to state a claim upon which relief can be granted. We treat such a motion as a motion for

[6] *Id.*

[7] *Id.*

[8] *Id.* at 12-48.

[9] *Id.* § 12.30[5], at 12-49.

[10] *Id.* at 12-48.1 to 12-49.

[11] *Id.* § 12.31[5], at 12-54 to -55.

[12] *Id.* § 12.31[4], at 12-54.

[13] *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 894 (9th Cir. 1996).

summary judgment "when matters outside the pleading are presented to and not excluded by the court."[14] When reviewing an order of summary judgment, we engage in the same inquiry as the trial court.[15] Thus, we consider the facts in the light most favorable to the nonmoving party.[16] Summary judgment is appropriate only if there is no genuine issue of material fact.[17]

¶18 Here, the trial court relied on the pleadings, loan agreement, forbearance agreements, and other loan documents when it denied NBC's CR 12(b)(1), (b)(2), and (b)(6) motions. Thus, de novo review of both the CR 12(b)(1) and (b)(2) decisions is appropriate. Because the court relied on documents outside of the pleadings when it denied the CR 12(b)(6) motion, we review the denial of this motion as a denial of summary judgment.

## SUBJECT MATTER JURISDICTION

### Constitutional Authority

¶19 NBC argues that the trial court erroneously concluded that it has subject matter jurisdiction of this breach of contract case. We disagree and hold that the superior court has subject matter jurisdiction of this action.

¶20 Whether Whatcom County Superior Court has subject matter jurisdiction of this action is generally a question whether the superior court has authority to decide

---

[14] *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985).

[15] *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002) (citing *Wilson v. Steinbach*, 96 Wn.2d 434, 437, 656 P.2d 1030 (1982)).

[16] *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 70, 170 P.3d 10 (2007).

[17] *Id.*

this type of case.[18] The supreme court recently considered the question of subject matter jurisdiction in *ZDI Gaming, Inc. v. Washington State Gambling Commission*.[19]

¶21 Jurisdiction, as the *ZDI* court explained, "describe[s] the fundamental power of courts to act."[20] Article IV of the Washington Constitution vests Washington's superior courts with " 'original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court.' "[21] This jurisdiction is a matter of law.[22]

¶22 As *ZDI* made clear, however, "jurisdiction" is "often used to mean something other than the fundamental power of courts to act."[23] Thus, "[s]ometimes 'jurisdiction' means simply the place or location where a judicial proceeding shall occur. Where jurisdiction describes the forum or location of the hearing, it is generally understood to mean venue."[24]

■ ¶23 In contrast to venue or other meanings of "jurisdiction," subject matter jurisdiction "is a particular type of jurisdiction, and it critically turns on 'the type of controversy.' 'If the type of controversy is within the [court's] subject matter jurisdiction, then all other defects or errors go to something other than subject matter jurisdiction.' "[25]

---

[18] *Dougherty v. Dep't of Labor & Indus.*, 150 Wn.2d 310, 315, 76 P.3d 1183 (2003) (quoting 77 AM. JUR. 2D *Venue* § 1, at 608 (1997)).

[19] 173 Wn.2d 608, 268 P.3d 929 (2012).

[20] *Id.* at 616.

[21] *Id.* (internal quotation marks omitted) (quoting *Shoop v. Kittitas County*, 149 Wn.2d 29, 37, 65 P.3d 1194 (2003)).

[22] *Id.* at 617.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 617-18 (citation omitted) (internal quotation marks omitted) (quoting *Dougherty*, 150 Wn.2d at 315-16; *Marley v. Dep't of Labor & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994)).

¶24 Here, NBC does not dispute that the superior court generally has subject matter jurisdiction to decide a breach of contract case. The state constitution generally provides such authority to the superior courts of this state.[26]

¶25 Rather, NBC argues that the court lacks subject matter jurisdiction here because NBC is a tribal corporation of the Nooksack Indian Tribe and the breach of contract cause of action arose on the Nooksack Reservation.[27] We now turn to that argument.

## Tribal Sovereign Immunity

¶26 NBC's subject matter jurisdiction argument is premised on the assertion that even if a tribal entity waives sovereign immunity, such a waiver does not provide jurisdiction to a state court. We disagree.

¶27 We first note that both parties concede that the sovereign immunity of the Nooksack Indian Tribe extends to NBC, its tribally chartered corporation.[28] This mutual concession is consistent with federal law.

¶28 Under federal law, Indian tribes have sovereign immunity.[29] This immunity also extends to "tribal agencies and instrumentalities as extensions of tribal government."[30] Such sovereign immunity is meant to protect the tribes as " 'distinct, independent political communities' " and allows them to retain their " 'original natural rights' in

---

[26] WASH. CONST. art. IV, § 6.

[27] Appellant's Opening Brief at 15-19.

[28] Report of Proceedings (Mar. 25, 2011) at 9-10.

[29] *Auto. United Trades Org. v. State*, 175 Wn.2d 214, 229-30, 285 P.3d 52 (2012); *Wright v. Colville Tribal Enter. Corp.*, 159 Wn.2d 108, 112, 147 P.3d 1275 (2006) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978)).

[30] *Wright*, 159 Wn.2d at 112.

matters of local self-government."[31] Thus, a state may not assert authority in Indian country if that would infringe "on the right of reservation Indians to make their own laws and be ruled by them."[32] This immunity consequently touches on the jurisdiction of a court to hear a case, though whether it actually affects a court's subject matter or personal jurisdiction is not clear.[33] Nor is this distinction determinative of the outcome in this case.

¶29 Analysis to determine whether state courts have jurisdiction differs if a party is a tribal entity rather than an individual Indian. Thus, in *Santa Clara Pueblo v. Martinez*,[34] the United States Supreme Court examined both a tribe's amenability to suit and the amenability of an individual tribal member.[35] There, the question whether an individual tribal officer could be sued in federal court depended on whether subjecting the dispute to a nontribal forum constitutes an infringement of the tribe's sovereignty.[36] But, when considering whether a tribe was subject

---

[31] *Santa Clara Pueblo*, 436 U.S. at 55 (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L. Ed. 483 (1832)).

[32] *Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959).

[33] *See Lewis v. Norton*, 424 F.3d 959, 961 (9th Cir. 2005) (reviewing the district court's dismissal for lack of subject matter jurisdiction where tribe asserted sovereign immunity); *E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302 (10th Cir. 2001) ("Tribal sovereign immunity is a matter of subject matter jurisdiction."); *Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*, 692 F.3d 1200, 1203 (11th Cir. 2012) (addressing the question of whether the district court properly dismissed the case for lack of subject matter jurisdiction due to tribal sovereign immunity). *But see In re Prairie Island Dakota Sioux*, 21 F.3d 302, 304 (8th Cir. 1994) ("Sovereign immunity, however, is not of the same character as subject matter jurisdiction."); *J.L. Ward Assocs. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1170 (D.S.D. 2012) (concluding that "the question . . . of whether the tribes' sovereign immunity bars J.L. Ward from bringing suit . . . is a jurisdictional issue separate from subject matter jurisdiction").

[34] 436 U.S. 49, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978).

[35] *Id.* at 58-59.

[36] *Id.*

to suit outside the reservation, the question revolved around whether it had waived its sovereign immunity.[37]

¶30 As the *Santa Clara Pueblo* Court concluded, in the case of a tribal entity, whether a court has jurisdiction where a party is entitled to tribal sovereign immunity is a question of federal law that depends on either congressional authorization or an express waiver of the immunity by the party.[38] In *Wright v. Colville Tribal Enterprise Corp.*, our state supreme court recognized this principle, noting that sovereign immunity "protects a tribal corporation owned by a tribe and created under its own laws, absent *express waiver of immunity by the tribe* or Congressional abrogation."[39]

¶31 This recognition is consistent with *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*,[40] in which the United States Supreme Court held that the Kiowa Tribe could not be sued in state court as it had *not* waived its sovereign immunity.[41] Specifically, the Court stated that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit *or the tribe has waived its immunity*."[42]

¶32 More recently, the United States Supreme Court adhered to the principle articulated in *Kiowa* in its decision in *C&L Enterprises, Inc. v. Citizen Band of Potawatomi*

---

[37] *Id.* at 58.

[38] *Auto. United Trades Org.*, 175 Wn.2d at 229-30; *Wright*, 159 Wn.2d at 111-12 (emphasis added) (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998)).

[39] 159 Wn.2d 108, 111-12, 147 P.3d 1275 (2006) (emphasis added) (citing *Kiowa Tribe*, 523 U.S. at 754).

[40] 523 U.S. 751, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998).

[41] *Id.* at 759-60.

[42] *Id.* at 754 (emphasis added); *see also Bradley v. Crow Tribe of Indians*, 2003 MT 82, 315 Mont. 75, 67 P.3d 306, 310 (holding that the state court had subject matter jurisdiction where a tribe had waived its sovereign immunity).

*Indian Tribe of Oklahoma.*[43] There, C&L, a non-Indian, sought to enforce its rights under its contract with the tribe.[44] It first pursued arbitration, as the contract provided.[45] The arbitrator made an award in favor of C&L.[46] The company then sought to enforce the award in state court.[47] Whether the state court had authority to enforce the award was at issue.[48] That, in turn, required determining whether the tribe had waived its sovereign immunity.[49]

¶33 The United States Supreme Court considered the contract between the Potawatomi and C&L. The arbitration clause provided for enforcement of the award according to American Arbitration Association rules.[50] These rules provided for entry of the award in " 'any federal or state court having jurisdiction thereof.' "[51] The Court noted that "[t]o relinquish its immunity, a tribe's waiver must be 'clear.' "[52] It also stated that once an abrogation of tribal immunity is found to have been expressed unequivocally, the suit in state court can proceed.[53] The Court then held that the arbitration provision there was sufficiently clear to waive the tribe's sovereign immunity and make it amenable to suit in state court.[54]

---

[43] 532 U.S. 411, 121 S. Ct. 1589, 149 L. Ed. 2d 623 (2001).

[44] *Id.* at 415-16.

[45] *Id.* at 416.

[46] *Id.*

[47] *Id.*

[48] *Id.* at 414.

[49] *Id.* at 418.

[50] *Id.* at 414-15.

[51] *Id.* at 415 (quoting Am. Arbitration Ass'n, Construction Industry Dispute Resolution Procedures R-48(c) (Sept. 1, 2000)).

[52] *Id.* at 418 (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991)).

[53] *Id.*

[54] *Id.* at 422-23.

■ ¶34  Here, as the parties concede, NBC, as a tribally chartered business, had sovereign immunity from suit. The question as demonstrated by *C&L* and *Kiowa* is whether it expressly waived that immunity. Paragraph 8.26 of the loan agreement states that it did:

> the Borrower hereby expressly grants to the Lender and all persons entitled to benefit from any Loan Document an *irrevocable limited waiver of its sovereign immunity from suit or legal process with respect to any Claim*. In furtherance of this waiver, the Borrower hereby consents with respect to any Claim: . . . (B) to be sued in (i) the United States District Court for Western District of Washington . . . (ii) any court of general jurisdiction in the State (including all courts of the State to which decisions of such courts may be appealed), and (iii) only if none of the foregoing courts shall have jurisdiction, or only to permit the compelling of arbitration in accordance with Section 8.27, or the enforcement of any judgment, decree or award of any foregoing court or any arbitration permitted by Section 8.27, all tribal courts and dispute resolution processes of the Tribe. The Borrower hereby expressly and irrevocably waives any application of the exhaustion of tribal remedies or abstention doctrine and any other law, rule, regulation or interpretation that might otherwise require, as a matter of law or comity, that resolution of a Claim be heard first in a tribal court or any other dispute resolution process of the Tribe.[55]

¶35  There is nothing ambiguous about NBC's express limited waiver of sovereign immunity for purposes of this loan transaction under the above terms of the loan agreement. In fact, this express waiver is even clearer than that approved by the United States Supreme Court in *C&L*. There, the Court concluded that the agreement to arbitrate necessarily meant a consent to the jurisdiction of state courts, where an arbitration award could be enforced.[56] Here, there is not only an express limited waiver of sovereign immunity, but a concomitant agreement that the

---

[55] Clerk's Papers at 446 (emphasis added).

[56] *C&L*, 532 U.S. at 422-23.

venue of any suit on a "Claim" would be in state, federal, or tribal court.

¶36 We note that similar waivers of sovereign immunity are contained in all three forbearance agreements. Thus, NBC expressly waived sovereign immunity throughout the course of this loan.

¶37 In sum, NBC, by virtue of the provisions in the loan and other agreements that it signed, expressly waived its sovereign immunity to suit on any "claim" in state court. As the trial court properly concluded in its denial of NBC's omnibus motion to dismiss, "Washington state courts have subject matter jurisdiction over breach-of-contract claims against tribes if the tribe consents to the civil jurisdiction of the state of Washington as permitted by federal law."[57] Because NBC waived its sovereign immunity—both in the loan agreement and the following three forbearance agreements—the superior court has subject matter jurisdiction to decide this breach of contract case.[58]

¶38 NBC's jurisdiction argument is premised on the assertion that the material facts here are that this is a civil suit by a non-Indian against an Indian, arising in Indian country. Consequently, it argues, the analysis outlined by the United States Supreme Court in *Williams v. Lee* applies here.[59] This assertion is incorrect.

¶39 *Williams* is both factually and legally distinguishable from this case. There, a non-Indian operated a general store on the Navajo Indian Reservation.[60] He sued an

---

[57] Clerk's Papers at 8.

[58] *See id.* at 584 ("Subject to the limitation on recourse in the other Loan Documents, each of the Borrower and the Tribe hereby expressly grants to the Lender and all Persons entitled to benefit from this Agreement an irrevocable limited waiver of its sovereign immunity from suit or legal process with respect to any Claim.").

[59] 358 U.S. 217, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959).

[60] *Id.* at 217.

Indian couple in Arizona state court.[61] The question before the United States Supreme Court was whether the state court had jurisdiction over this suit, between *individual* Indians and a non-Indian.[62] The court concluded that "[t]here can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of Indians to govern themselves."[63]

¶40 Here, we are faced with a case concerning a tribal entity, not an individual Indian. Consequently, the concerns regarding tribal sovereignty as expressed in *Williams* do not apply. Nor does it matter where the cause of action arose. The tribe *explicitly waived its sovereignty*. The applicable line of United States Supreme Court cases addresses whether a tribal entity may waive its sovereign immunity and submit to state court jurisdiction. These cases have held that tribal entities may do so, and these holdings have neither abrogated nor touched on the Court's holding in *Williams*.

¶41 NBC next attempts to distinguish *C&L* and *Kiowa* by arguing that these cases decided whether the tribe waived its sovereign immunity, not whether the state court had subject matter jurisdiction.[64] This argument is unconvincing.

¶42 As we explained earlier in this opinion, some courts treat tribal sovereign immunity as an aspect of subject matter jurisdiction. Thus, the United States Supreme Court's analysis of waiver of sovereign immunity of the tribe in *C&L* may be viewed as an aspect of subject matter jurisdiction, although these words appear nowhere in the opinion.

---

[61] *Id.* at 218.

[62] *Id.*

[63] *Id.* at 223.

[64] Appellant's Opening Brief at 26.

¶43 To the extent other courts treat tribal sovereign immunity as something not of the same character as subject matter jurisdiction, NBC fails to explain why that distinction makes any difference to the outcome in this case. We fail to see any difference in the outcome based on that potential distinction.

¶44 NBC also attempts to distinguish *C&L* on the basis that the activities in that case took place off the Indian reservation. That factual distinction is not material. The dispositive issue in that case was the tribe's waiver of sovereign immunity. The fact that activities took place off the reservation did not enter into the United States Supreme Court's analysis. For the same reason, where the activities in this loan transaction occurred is immaterial to our analysis.

¶45 In sum, there is no material distinction between the *Kiowa* and *C&L* line of cases and the reasoning that we apply to this case. Those cases hold that suits against a tribal entity may proceed where either Congress authorizes such suits or the entity waives sovereign immunity.[65] As we explained earlier, NBC expressly waived that immunity in the loan agreement and other documents. Thus, our state courts have jurisdiction over this suit.

¶46 NBC also relies on *Cohen v. Little Six, Inc.*,[66] a Minnesota Court of Appeals decision. It argues that waiver of sovereign immunity and subject matter jurisdiction should not be conflated.[67] But, as we previously stated in this opinion, this case does not require us to determine whether waiver of tribal sovereign immunity must be exclusively characterized as an element of subject matter jurisdiction. It makes no difference here. If it is properly characterized as an element of subject matter jurisdiction, then NBC has expressly waived the immunity. Thus, the

---

[65] *See C&L*, 532 U.S. at 418-19; *see also Kiowa*, 523 U.S. at 754-55.

[66] 543 N.W.2d 376 (Minn. Ct. App. 1996).

[67] Appellant's Reply Brief at 2.

superior court has subject matter jurisdiction to decide the case based both on its constitutional authority to decide breach of contract cases and the express waiver of tribal immunity. If, on the other hand, sovereign immunity is properly characterized as something else, NBC has failed to persuade us that there is any difference in the outcome to this case because of that different characterization.

¶47 In any event, as we previously observed, *C&L* and *Cohen* echo the principle that a tribe may waive its sovereign immunity and consent to suit in state court if it does so expressly and unequivocally.[68] That is the principle that we apply in this case.

¶48 NBC also argues that Public Law 280 (P.L. 280) demonstrates that this state's superior court lacked jurisdiction over this suit.[69] In response, OSM argues that P.L. 280 does not control whether subject matter jurisdiction exists in this action. We agree with OSM.

¶49 "Through what is commonly known as . . . [ ]P.L. 280[ ] . . . Congress provided to certain states broad jurisdiction over criminal offenses committed in Indian country, and limited jurisdiction over civil causes of action arising in Indian country."[70] Washington is one of these states.[71] Though NBC argues that P.L. 280 applies to tribes and individual Indians, that argument is belied by the statute.

¶50 "Our primary duty in interpreting any statute is to discern and implement the intent of the legislature."[72] When a legislature uses different words in the same stat-

---

[68] *Cohen*, 543 N.W.2d at 379 (citations omitted).

[69] 25 U.S.C. § 1322.

[70] *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1027-28 (9th Cir. 2011) (footnote and citation omitted), *cert. denied*, 132 S. Ct. 1098 (2012).

[71] RCW 37.12.010(1)-(8).

[72] *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (citing *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)).

ute, we presume it intends those words to have different meanings.[73]

¶51 Here, it is clear from the language of P.L. 280, codified at 25 U.S.C. § 1322, that there is a distinction between "Indians" and "Indian tribes." The statute reads:

(a) Consent of United States; force and effect of civil laws

The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which *Indians* are parties . . . .

. . . .

[(b)] Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any *Indian* or any *Indian tribe*, band, or community that is held in trust.[73]

¶52 Under the statute, Congress limited its consent to States over civil causes of action to "Indians." By its own terms, the statute also mentions "Indian tribes." We must presume that these terms mean different things. Thus, Congress did not intend for P.L. 280 to apply to tribes or tribal entities, only individual Indians.

¶53 This interpretation has been confirmed by the Supreme Court in *Bryan v. Itasca County*.[75] There, the United States Supreme Court concluded that "there is notably absent any conferral of state jurisdiction over the *tribes themselves*" under P.L. 280.[76] State courts may obtain jurisdiction over tribes not through P.L. 280, but through the tribe's own waiver of sovereign immunity. That is what occurred here.

¶54 NBC, in its reply, fails to persuasively distinguish the language of P.L. 280 or the Court's interpretation of it in

---

[73] *Koenig v. City of Des Moines*, 158 Wn.2d 173, 182, 142 P.3d 162 (2006).

[74] 25 U.S.C. § 1322 (emphasis added).

[75] 426 U.S. 373, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976).

[76] *Id.* at 388-89; *see also Cohen*, 543 N.W.2d at 381 ("While Public Law 280 applies to actions involving 'Indians,' this grant of jurisdiction does not apply to Indian *tribes*.").

*Bryan.* Instead, NBC argues that P.L. 280 is relevant here on the basis of another subsection of the law: property of the tribal corporation. It appears to claim that sovereign immunity also extends to the property of the immune sovereign, and that the waiver which appeared in the loan documents did not waive this protection.

¶55 The waiver in question applies to any "Claim," which is further defined in the loan agreements as *"any* dispute, claim or controversy between the parties hereto arising out of or relating in any way to this Agreement or any other Loan Document or any actions contemplated to be taken in accordance herewith or therewith."[77] This definition is sufficiently broad to include a waiver of the tribal corporation's sovereignty as well as the sovereign protection of its property. Thus, NBC's argument is unpersuasive.

¶56 Finally, NBC argues that the loan and other agreements do not express its consent—express or implied—to subject matter jurisdiction.[78] Based on the plain language of paragraph 8.26 of the loan agreement that we quoted above, this argument is untenable.

¶57 NBC specifically argues that the language we quoted above recognizes that the listed venues may not have subject matter jurisdiction. From this, NBC correctly argues that mere consent to be sued in a particular court does not alone confer subject matter jurisdiction over a suit.[79] NBC then concludes that a forum selection clause cannot, by itself, confer subject matter jurisdiction on a court.[80]

¶58 First, whether the language on which NBC relies suggests the parties recognized that the listed venues may

---

[77] Clerk's Papers at 396 (emphasis added).

[78] Appellant's Opening Brief at 23.

[79] *Habeas Corpus of Wesley v. Schneckloth,* 55 Wn.2d 90, 93-94, 346 P.2d 658 (1959).

[80] *Barnett v. Hicks,* 119 Wn.2d 151, 161, 829 P.2d 1087 (1992).

not have subject matter jurisdiction is irrelevant. Whether a court has jurisdiction is not decided on the basis of what the parties may have thought. Either a court has subject matter jurisdiction or it does not, regardless of what the parties to a case may think.

¶59 Second, consent to be sued in a particular forum does not confer jurisdiction, as we have just acknowledged. Likewise, a forum selection clause, by itself, does not create subject matter jurisdiction. But neither of these two considerations controls here. That is because NBC expressly waived its sovereign immunity for purposes of this loan transaction.

¶60 For these reasons, we reject NBC's argument that the language of paragraph 8.26 is anything other than what the plain language states: an express limited waiver of sovereign immunity by NBC and an agreement as to the possible venues of any action arising from the loan and other agreements.

¶61 In its opening brief, NBC suggests an alternative argument for dismissal under CR 12(b)(3): dismissal for improper venue. We need not address this claim because the trial court did not deal with it, nor, on appeal, does either party fully elaborate on it.

## PERSONAL JURISDICTION

¶62 NBC next argues that the trial court lacked personal jurisdiction over it because the loan and other agreements are void and unenforceable under the Indian Gaming Regulatory Act (IGRA). We disagree.

### *IGRA*

¶63 In passing IGRA, Congress "sought to develop" a regulatory framework "that would protect tribes from unscrupulous contractors and criminals but would not unnecessarily interfere with the tribes' sovereignty or economic

self-sufficiency."[81] Thus, Congress stated in IGRA's declaration of policy that it was meant "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[82] IGRA was also intended "to ensure that the Indian tribe is the primary beneficiary of the gaming operation."[83]

¶64 IGRA established a National Indian Gaming Commission within the Department of the Interior.[84] Under IGRA, "[a]n Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman."[85] Class III facilities provide blackjack, roulette, slot machines, and other games in which a gambler plays against "the house."[86]

## Management Contracts

¶65 We first note that the loan in question here included language that expressly stated that NBC would manage the casino and that NBC would have managerial control.[87] Further, before agreeing to the second forbearance agreement, tribal counsel for NBC provided an opinion letter confirming that the agreement was "a valid agreement of the Borrower and the Tribe" and consequently did not constitute a management contract under IGRA.[88] Such

---

[81] *Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 687 (7th Cir. 2011).

[82] 25 U.S.C. § 2702(1).

[83] *Id.* § 2702(2).

[84] *Id.* § 2704(a).

[85] *Id.* § 2710(d)(9).

[86] *Id.* §§ 2703(7)(B), 2703(8); *Wells Fargo Bank*, 658 F.3d at 688.

[87] Clerk's Papers at 448.

[88] *Id.* at 630.

opinion letters are common in commercial loan transactions like this one.[89]

¶66 The existence of such letters or disclaimers in a particular loan transaction is not, by itself, dispositive of legal questions arising from such transactions. But it is noteworthy that NBC fails to persuasively explain why it now argues that the loan and other agreements constitute management contracts under IGRA when its tribal counsel expressly represented to the lender, on behalf of NBC, that these agreements were not management contracts. In any event, we proceed to analyze this argument, making our own independent decision whether it has any merit.

¶67 As the Seventh Circuit noted in *Wells Fargo Bank, National Ass'n v. Lake of the Torches Economic Development Corp.*, whether a contract between a tribe and another constitutes a management contract "is, fundamentally, a question of statutory interpretation" and must begin with the language of IGRA.[90]

¶68 IGRA defines a "management contract" as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation."[91] Additionally, it defines a "primary management official" as a

---

[89] *See Hawai'i 2000 Report Regarding Lawyers' Opinion Letters in Mortgage Loan Transactions*, 22 U. HAW. L REV. 347 (2000); *Stock W. Corp. v. Taylor*, 964 F.2d 912 (9th Cir. 1992) (corporation alleged legal malpractice and misrepresentation in an attorney's drafting of an opinion letter to secure a loan for construction on tribal land); *Nuveen Mun. Trust v. Withumsmith Brown, PC*, 692 F.3d 283 (3d Cir. 2012) ("In connection with the transaction, Bayonne provided Nuveen with an . . . opinion letter."); *Fortress Sys., LLC v. Bank of W.*, 559 F.3d 848, 850 (8th Cir. 2009) ("The terms of the commitment letter were subject to the approval and execution of formal loan documents, [and] the production of satisfactory opinion letters by legal counsel.").

[90] 658 F.3d 684, 693 (7th Cir. 2011).

[91] 25 C.F.R. § 502.15.

person who has authority "to set up working policy for the gaming operation."[92]

¶69 The pronouncements of the National Indian Gaming Commission (NIGC) through its NIGC Bulletin also provide guidance for what constitutes management.[93] Management activities include " 'planning, organizing, directing, coordinating, and controlling . . . all or part of a gaming operation.' "[94]

¶70 As the *Lake of the Torches* court concluded, there is no clear indication in the language of IGRA itself whether Congress intended to include contracts with third parties "whose primary, or only, role is to infuse capital into a gambling operation."[95] But, it noted that the NIGC's pronouncements indicated that such agreements were constrained by IGRA's rules, and it held that such an agreement could constitute a management agreement.[96]

¶71 Further buttressing this analysis is the legislative purpose of IGRA. Congress's stated goal in enacting IGRA was "to provide a comprehensive regulatory framework for gaming operations by Indian tribes that would promote tribal economic self-sufficiency and strong tribal governments."[97] A primary concern underlying the legislation was that "Indian tribes be the primary beneficiaries of fair and honest gaming operations."[98]

There is a general concern that the participation of *any* party in the actual management of a tribal gaming facility—whether

---

[92] *Id.* § 502.19(b)(2).

[93] *Wells Fargo Bank, NA v. Sokaogon Chippewa Cmty.*, 787 F. Supp. 2d 867, 878 (E.D. Wis. 2011).

[94] *Id.* (quoting NIGC Bulletin 94-5, available at http://www.nigc.gov/Reading_Room/Bulletins/Bulletin_No._1994-5.aspx).

[95] *Lake of the Torches*, 658 F.3d at 695, 697.

[96] *Id.*

[97] *Id.* at 694.

[98] *Id.*

through a traditional contract to oversee the daily operations of the facility or through a financing scheme that permits the provider of funding intermittently to interject itself in the management decisions of the facility to ensure the security of its investment—should be subject to the Chairman's scrutiny and approval as a management contract.[99]

¶72 Under IGRA, where an Indian tribe enters "into a management contract for the operation and management of" its class II or III gaming activity, the tribe must submit the agreement to the Chairman of the Indian Gaming Regulatory Commission for his or her approval.[100] A management contract that has not been approved by the Chairman is void.[101] But there is no authority to suggest that an agreement that is not approved by the Chairman is void, provided that it is not a management contract. Thus, lack of Commission approval is material only if an agreement constitutes a management contract.

¶73 Courts may look to all documents that constitute the agreement between a tribe and another party when assessing whether it constitutes a management contract.[102]

¶74 In *Wells Fargo Bank, NA v. Sokaogon Chippewa Community*,[103] a federal district court held that the trust indenture between Wells Fargo and the tribe did not constitute a management agreement under IGRA.[104] There, the Sokaogon Chippewa Community issued $19.165 million in bonds pursuant to a trust indenture between the Sokaogon and Wells Fargo.[105] The agreement authorized Wells Fargo, as the trustee for the bondholders, to act on

---

[99] *Id.* at 697 (emphasis in original).

[100] 25 U.S.C. §§ 2711(a)(1), 2710(d)(9).

[101] 25 C.F.R. § 533.7.

[102] *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 423 (8th Cir. 2002).

[103] 787 F. Supp. 2d 867 (E.D. Wis. 2011).

[104] *Id.* at 870.

[105] *Id.*

their behalf.[106] Each document representing an agreement between Wells Fargo and the Sokaogon contained a waiver of sovereign immunity.[107]

¶75 As part of that loan agreement, the Sokaogon were required to pay the trustee a monthly portion of the principal and interest on the bonds.[108] The Sokaogon also had to spend "at least 1 million every two years for capital improvements to the Casino Facility [and] deposit $41,667 into a Capital Expenditure Fund each month."[109] To secure the bonds, Wells Fargo had a first priority lien on " 'all right, title and interest in and to the Gross Revenue of the Casino Facility remaining after payment of Operating Expenses of the Casino Facility.' "[110]

¶76 After complying with the terms of the agreement for two years, the Sokaogon failed to make the required payments.[111] After Wells Fargo sued the Sokaogon, the tribe moved for dismissal based on the alleged lack of subject matter and personal jurisdiction and on the alleged failure of Wells Fargo to state a claim for relief.[112] The tribe argued that the indenture/loan agreement constituted an unauthorized management agreement under IGRA and was consequently void.[113]

¶77 The federal district court disagreed. The court emphasized that the agreement did not confer any management responsibilities on the trustee with respect to the

---

[106] *Id.*

[107] *Id.* at 870-71.

[108] *Id.* at 871.

[109] *Id.*

[110] *Id.*

[111] *Id.* at 871-72.

[112] *Id.* at 870.

[113] *Id.* at 872.

tribe's gaming operations.[114] The court highlighted seven factors the National Indian Gaming Commission had noted would be indicative of a management contract:

> "* Maintenance of adequate accounting procedures and preparation of verifiable financial reports on a monthly basis;
>
> "* Access to the gaming operation by appropriate tribal officials;
>
> "* Payment of a minimum guaranteed amount to the tribe;
>
> "* Development and construction costs incurred or financed by a party other than the tribe;
>
> "* Term of contract that establishes an ongoing relationship;
>
> "* Compensation based on percentage fee (performance); and
>
> "* Provision for assignment or subcontracting of responsibilities."[115]

Then, the court concluded that the agreement did not confer any of the listed responsibilities on Wells Fargo with respect to the Sokaogon's gaming operation.[116]

¶78 The district court did note that the agreement required the Tribe to take certain actions—(1) appoint a receiver in case of default, (2) provide a certain level of income to service the debt, (3) hire an independent consultant if it fell behind in its payments, (4) make monthly deposits into a "Capital Expenditure" account, and (5) spend at least a certain amount on casino capital expenditures.[117] But, the court emphasized that despite these requirements, the tribe was free to make the principal business decisions for the casino.[118] Wells Fargo never usurped the tribe's control.[119]

---

[114] *Id.* at 879.

[115] *Id.* at 879 (quoting NIGC Bulletin 94-5).

[116] *Id.*

[117] *Id.* at 877-79.

[118] *Id.* at 881-82.

[119] *Id.*

¶79 Here, NBC's casino includes class III gaming.[120] Five documents constitute the relevant agreements between NBC and the lender for purposes of the issues before us: the loan agreement, the springing depository agreement, and the three forbearance agreements. Notwithstanding the disclaimer contained in the loan agreement and the letter from NBC's tribal counsel opining that the documents do not constitute management contracts, the language of the agreements supports this conclusion as well.[121]

¶80 Here, as in *Sokaogon*, OSM "was not responsible for the maintenance of accounting procedures or preparation of financial reports."[122] Nor did the loan documents provide for a minimum payment to NBC, or require it to incur or finance development or construction costs.[123] And, unlike in *Sokaogon*, there was no " '[p]rovision for assignment or subcontracting of responsibilities.' "[124]

¶81 In this case, as in *Sokaogon*, the agreement granted OSM a security interest in certain proceeds from the casino. But, notably, this security interest in "Pledged Revenues" excluded the casino's "Daily Cash-on-Hand Requirements," as they were defined in the agreement. Likewise, "Pledged Revenues" are expressly subject to the "prior application of [such revenues] to pay Operating Expenses."[125] As the NIGC's opinion letter stated in *Sokaogon*, " 'Excluding operating expenses from gaming revenues in which a party is granted a security interest ensures that the secured

---

[120] Clerk's Papers at 7-8.

[121] *Id.* at 448, 614-15.

[122] *Sokaogon*, 787 F. Supp. 2d at 879.

[123] *Id.*

[124] *Id.* (quoting NIGC Bulletin 94-5).

[125] Clerk's Papers at 457, 545.

party cannot manage the gaming facility should the tribe default.' "[126]

¶82 It is undisputed that under the terms of the agreements, NBC, in its sole discretion, determined its "Operating Expenses." The requirement that it certify the amount of such expenses does nothing to change that. Thus, NBC had the sole managerial ability to manage cash for its day-to-day operations and to determine and pay its operating expenses without interference by OSM.

¶83 In the event of a default, NBC was required to first deposit all gross revenues in the "Pledged Assets" account. But the amount needed by NBC for operating expenses was immediately transferred to an "Operating Account" by the depository. Thus, even in the event of a default, the loan agreement provided that NBC would be able to allocate and *manage* its own operating expenses. And such expenses were payable prior to allocation to OSM's pledged revenues.

¶84 NBC points to several provisions in the loan documents to support its argument that they are management contracts.[127] These provisions do not support NBC's argument.

¶85 NBC claims that the definition of "Operating Expenses" includes only current expenses and excludes aged accounts. According to it, this provision functionally operated as management control by the lender over how and when operating expenses are paid. This argument is not persuasive.

¶86 "Operating Expenses" are defined in the springing depository agreement and loan agreement as

the *current expenses* of operation, maintenance and repair of the Facilities, as determined consistently with [generally accepted accounting principles], excluding capital expenditures and excluding those items expressly excluded below, but includ-

---

[126] *Sokaogon*, 787 F. Supp. 2d at 879 (alteration in original).

[127] Appellant's Opening Brief at 36-39.

ing Permitted Tribal Gaming Commission Expenses. *Operating Expenses shall include, without limitation*, prizes, wages, salaries and bonuses to personnel, *the cost of materials and supplies used for current operation and maintenance*, security costs, utility expenses, trash removal, cost of goods sold (other than with respect to tribal crafts sold in the gift shop), advertising, insurance premiums, rental payments for real or personal property (other than capital lease payments).[128]

¶87 There is nothing in the plain language of this definition to suggest that "current expenses" excludes past due accounts. There is no definition of the term in the documents. And the breadth of specific items included within the scope of that term does nothing to exclude past due accounts from this type of expense.

¶88 NBC makes the same argument based on the definition of "Operating Budget." But this argument is no more persuasive than the one based on the definition of "Operating Expenses." In sum, there is nothing in either definition to suggest that OSM exercises any managerial control over which of NBC's creditors or debts is paid.

¶89 A related argument that NBC advances is that OSM exercises managerial control by virtue of the express terms in the Third Forbearance Agreement. Specifically, the argument is based on a revised definition of "Operating Expenses" in that agreement:

> The definition . . . will not, in any event, include past due accounts *payable of the Borrower which may be paid in accordance with clause (vi) (below)*
>
> . . . .
>
> (vi) . . . the Depository shall transfer to the Secured Obligations Account (and to the applicable sub-account related to the Note and the other Loan Documents) from and to the extent of amounts in the Pledged Revenues Account an amount equal to the amount of all accrued and unpaid interest on, and any

---

128 Clerk's Papers at 535 (emphasis added).

unpaid principal of, the Note, any accrued and unpaid Servicing Fees, any due and unpaid late charges and any other unpaid fees, costs and expenses payable by the Borrower *in connection with the Loan Documents* . . . .[129]

¶90 Contrary to NBC's assertion, this revised definition is not an exercise of managerial control of payments to NBC's creditors. The emphasized language in the above quotation makes clear that the provision applies only to the delinquent loan that is the subject of this action, not any other debt of NBC. This is not managerial control in the IGRA sense, as illustrated by omission in NBC's brief of the first emphasized text in the above quotation.

¶91 NBC further asserts that the deposit of its "gross revenues" into OSM-controlled accounts in the event of default makes NBC the de facto manager of NBC's casino operations. This assertion is factually and legally incorrect.

¶92 First, in the event of default, NBC does not deposit "gross revenues" into OSM-controlled accounts. As we previously explained, "Daily Cash-on-Hand Requirements" are expressly excluded from "Pledged Revenues." And "Operating Expenses" take priority over allocation of funds to the "Pledged Revenues" account. NBC thus has exclusive managerial control over both of these portions of "gross revenues."

¶93 Second, NBC fails to explain why the mere deposit of its funds, as is required when it is in default under the terms of the loan agreement, constitutes managerial control by OSM. More than an assertion is required, particularly where such measures are commonly required when a commercial loan of this type is in default.

¶94 NBC heavily relies on *Lake of the Torches*, where the Seventh Circuit held that the bond indenture in question constituted a management contract.[130] But, that case is distinguishable.

---

[129] Clerk's Papers at 642-43 (emphasis added).

[130] 658 F.3d at 702.

¶95 There, the Seventh Circuit emphasized several factors that contributed to the agreement's status as a management contract.[131] It highlighted that **gross revenues** from the casino had to be deposited daily in a trust fund, giving Wells Fargo "ultimate control over withdrawals."[132] But, as we have explained above, that is not the case here.

¶96 The Seventh Circuit also noted that the agreement limited the casino's capital expenditures, unless the tribe received consent from Wells Fargo.[133] Here, in the event of a default, the loan agreement did require that NBC **notify** OSM of its daily expenses. And later, under the forbearance agreements, NBC had to provide a written restructuring plan and other financial projections to OMS. But, unlike in *Lake of the Torches*, the agreement did not require that NBC obtain **approval** from OSM regarding the amount of those expenses.

¶97 Most notably, in *Lake of the Torches*, if the tribe fell behind in payments, the agreement required it to "retain an Independent management consultant," approved by the bondholder representative, to make recommendations as to how to improve cash flow.[134] The tribe was also not able to remove or replace the casino's general manager, controller, or executive director for any reason without the consent of 51 percent of the bondholders.[135] At no time did OSM have any such control over NBC's expenditures or decisions.

¶98 In its reply brief, NBC makes several new arguments regarding the second forbearance agreement. Because issues raised for the first time in reply are "too late

---

[131] *Id.* at 697-99.

[132] *Id.* at 698.

[133] *Id.*

[134] *Id.*

[135] *Id.*

to warrant consideration," we need not address NBC's arguments.[136]

## FAILURE TO STATE A CLAIM

¶99 NBC finally argues that OSM fails to state a claim upon which relief could be granted because the loan and other agreements are void and unenforceable under IGRA. We again disagree.

¶100 Our review of a trial court's CR 12(b)(6) motion depends on whether it considered matters outside the pleadings in making its ruling.[137] Where it did, we review the CR 12(b)(6) motion as a summary judgment motion and the facts are viewed in the light most favorable to the nonmoving party.[138]

¶101 Here, the trial court examined the loan documents in addition to the pleadings. Thus, we review its order de novo as we would a summary judgment order.[139]

¶102 The underlying premise of NBC's argument is that the loan and other agreements are void and unenforceable. We previously discussed in this opinion why these agreements are neither void nor unenforceable under IGRA.

¶103 NBC makes no other argument why OSM fails to state a breach of contract claim in the complaint. Accordingly, we reject this argument as unsubstantiated in the record before us.

## SUMMARY

¶104 To summarize, we hold that the superior court has subject matter jurisdiction of this action on a contract

---

[136] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[137] *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985).

[138] *Id.*

[139] *Id.*

against a tribal entity that has waived its sovereign immunity for purposes of this loan transaction. The court also has personal jurisdiction over the tribal entity because the loan documents are not unapproved management contracts under IGRA. That is because they are not management contracts under the law. NBC has failed to show that OSM has failed to state a claim for relief.

¶105 We affirm the amended order denying the omnibus motion to dismiss.

LEACH, C.J., and SPEARMAN, J., concur.

Review granted at 177 Wn.2d 1019 (2013).