# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NORTH OAKES MANOR CONDOMINIUM ASSOCIATION, | No. 51616-1-II |
| Appellant, | UNPUBLISHED OPINION |
| v. | |
| 2nd HALF LLC; JEFFREY ALAN GRAHAM; STEPHEN ROY DAWSON; JOHN STAFFORD MILLS AND JULIE M. MILLS, | |
| Respondents. | |

GLASGOW, J. — North Oakes Manor Condominium consisted of eight units in Tacoma. The owners collectively agreed to terminate their condominium and sell the property. All of the owners signed and recorded a written condominium termination agreement as required by the statute governing condominium terminations. Both that statute and the termination agreement provided that after closing, proceeds of the sale together with all other assets of the North Oakes Manor Condominium Association would be held by the association "as trustee" for the association's creditors and unit owners. Pursuant to the association's articles of incorporation, the termination agreement also provided that any "payment and disbursement" of the post-closing proceeds and assets were subject to a vote of the owners "to which at least [80] percent of the votes in [the] Association are allocated."

The association sued 2nd Half LLC, an owner of two of the condominium units and a member of the association, thus bringing claims and incurring litigation expenses without the agreement of 80 percent of the unit owners. The superior court found that 80 percent of the owners

had not voted to authorize any cause of action and dismissed the association's lawsuit. The association appeals. We affirm.

FACTS

The association's articles of incorporation and bylaws specified that a board of directors comprised of three members would govern the association. The association's articles of incorporation provided that the association could be dissolved "with the assent given in writing and signed by unit owners of units to which at least [80] percent of the votes in the Association are allocated." Clerk's Papers (CP) at 183; *see also* CP at 256 (condominium declaration).[1] The articles of incorporation also provided that in the event of an approved dissolution, "unless otherwise authorized by law *and* by a vote of members . . . having at least [80] percent of the total votes in the Association," the association's assets "shall be owned by all members of the Association as tenants in common according to their percentages of undivided interest." CP at 183 (emphasis added). Thus, if the assets were to be distributed, rather than held as tenants in common, the articles of incorporation provided that 80 percent of the total votes in the association had to approve the plan.

There has been a contentious history between North Oakes's unit owners and varying configurations of the condominium association board of directors. 2nd Half owned two units, or 25 percent. Geraldine Ward owned 2nd Half, and it was managed by her son, Jeff Graham. Ward borrowed money from Stephen Dawson and another lender in order to purchase the two North Oakes units, which were encumbered by deeds of trust. In March 2014, Graham became the

---

[1] "Declaration" means "the document, however denominated, that creates a condominium by setting forth the information required by RCW 64.34.216 and any amendments to that document." RCW 64.34.020(17).

president of the North Oakes Manor Condominium Association board, and John Mills provided legal representation.

After a series of disputes, the association removed Graham and the other members from the board in late 2014. The association accused Graham of using approximately $14,050 in association funds for personal use. The association then elected George and Heather Rankos, who owned three units, and Heather Webster, who owned one unit, to the board. The association's new board hired Douglas Schafer to provide legal representation for the association. Schafer alleged to the board that Mills had inappropriately taken $7,267 in association funds as attorney fees.

Starting in 2015, 2nd Half stopped paying association dues and other assessments for repairs to the building foundation. The unpaid assessments resulted in a statutory lien on 2nd Half's units. See RCW 64.34.364. In February 2017, the association filed a complaint to collect condominium assessments and foreclose liens against 2nd Half and Dawson. At the time, the association alleged 2nd Half owed it $23,475.48 for delinquent assessments on one of the units and $21,144.60 for delinquent assessments on the other unit. The association asked the court to appoint a receiver to collect rents and filed a corresponding motion. Graham filed a declaration opposing the appointment of a receiver. The court denied the motion for appointment of a receiver without prejudice.

After ongoing controversy between Graham and Mills on one side and the board members and Schafer on the other, all of the owners decided to terminate the condominium association and sell each of their respective units.

RCW 64.34.268 required that the owners execute and record a termination agreement. The owners negotiated the precise language of the agreement. The first draft did not provide that the

3

sale would occur free of all of the association's liens, nor did it provide that the condominium owners had to approve payments and disbursements from the proceeds. Mills and Graham objected to an agreement without these clauses. No unit owner agreed to sign the contract as first drafted.

After negotiations, all of the owners agreed to dissolve the association and all signed the termination agreement, which provided, in part:

> 2. **Procedure.** RCW 64.34.268 prescribes the procedure for terminating a condominium and selling the former units and common elements of the condominium. Consistent with that statute, effective upon the recording of this Termination Agreement, title to the NOM Real Property will vest in North Oakes Manor Condominium Association, a Washington nonprofit corporation (hereafter "NOM Association"), as trustee for the holders of all interests in the units. Thereafter, NOM Association will have all powers necessary and appropriate to effect the sale of the NOM Real Property upon the minimum terms described herein, *and shall do so free of any liens claimed by it*. The escrow agent closing the sale shall pay from the proceeds the amounts due to the holders of mortgages, deeds of trust, and real estate contracts on individual units, judgments and property taxes that constitute liens, and customary closing costs. The remaining proceeds of the sale *and all other assets of NOM Association will be held by it as trustee for its creditors and the unit owners. Pursuant to a payment and disbursement plan that is agreed to by the unit owners to which at least eighty percent of the votes in NOM Association are allocated, NOM Association shall pay its creditors and disburse its remaining assets to the unit owners as their interests may appear, after which it shall dissolve.*

CP at 119 (emphasis added). The termination agreement also set forth the minimum terms of sale. The termination agreement was recorded with the county auditor in July 2017.

In September 2017, the North Oakes condominium building was sold for $1.35 million. The escrow agent paid from the proceeds the amounts due to the holders of mortgages, deeds of trust, and real estate contracts on individual units, judgments and property taxes that constituted liens, and customary closing costs. In particular, the escrow agent made a payoff to Dawson—who held deeds of trust on 2nd Half's two units—in the amount of $244,869.55. The association's

4

attorney, Schaefer, became aware of this claimed payoff amount just before the sale was finalized, but neither Schaefer nor the other condominium unit owners halted the sale. After the escrow agent fulfilled his duties, $773,768.13 in proceeds remained, which were transferred to the association. Schafer received these funds and put them in his IOLTA account.

With regard to the large escrow payout to Dawson, Schaefer suspected that 2nd Half, Mills, and Dawson had colluded to inflate Dawson's lender payoff amount. Schafer decided that by doing so they had "repudiated" the negotiated termination agreement. CP at 311. A day later, Schafer made a plan for payment and disbursement. Schafer claimed that he received e-mail approval from six of the unit owners (or 75 percent of the association's allocated votes). The plan was not agreed to by the unit owners to which at least 80 percent of the votes in the association were allocated because 2nd Half, which owned 25 percent of the units, did not approve the plan.

Nevertheless, Schafer first disbursed to himself his accumulated legal fees in the amount of $121,770.25. It appears he then made payments and disbursements to all of the unit owners except for 2nd Half.[2] The ledger indicates that the association was claiming as assets three pending legal claims: (1) a claim for assessments against 2nd Half in the amount of $51,978.49; (2) a claim against Graham in the amount of $14,050; and (3) a claim against Mills in the amount of $7,267. After all of the payments had been made and disbursed, it appears the balance was $30,687.68; Schafer reserved $5,000 from each of the six unit owners (not including 2nd Half) for litigation expenses.

---

[2] This proceeding does not include any legal challenge to Schaefer's disbursement to himself of the accumulated legal fees or his further disbursement to all of the unit owners except 2nd Half.

The association then amended its preexisting complaint against 2nd Half and Dawson, adding Graham and John and Julie Mills as defendants in October 2017. It amended its complaint a second time in January 2018. Relevant here, the association's second amended complaint maintained its claims that 2nd Half wrongfully failed to pay dues and assessments that were due to the association and sought recovery of the amount due plus interest. It also added allegations that John Mills breached his fiduciary and ethical duties to the association, including the duty of loyalty; Graham breached his fiduciary duties to the association by misappropriating funds; and Dawson's deeds of trust were junior to the association's assessment lien. The second amended complaint sought recovery from Mills and Graham for the money they allegedly misappropriated, as well as recovery from Dawson of "any unwarranted amount he received as his asserted payoff." CP at 425. The association also requested attorney fees and costs authorized by the condominium declaration, RCW 64.34.364(14), and equitable principles.

2nd Half moved for an order directing deposit of the remaining funds in Shafer's IOLTA account into the court registry. The motion alleged that Schafer wrongfully disbursed almost all of the association's post-escrow proceeds and assets from his IOLTA account without approval of a payment and disbursement plan agreed to by 80 percent of the association's owners. In response, the association asserted that the board of directors had approved the payment and disbursement of the remaining proceeds of the sale and all other assets, including the cause of action against 2nd Half and others. The trial court entered an order denying the motion to deposit the funds into the court registry, but the court directed Schafer to make no further withdrawals of the remaining approximately $30,000 in association funds from his IOLTA account without court approval.

6

2nd Half next moved under CR 12(b)(6) to dismiss the lawsuit without prejudice, asserting that the association, as trustee, lacked authority to pursue the lawsuit against 2nd Half under RCW 64.34.268 and the termination agreement. 2nd Half argued, based on RCW 64.34.268 and the termination agreement, that all assets of the association were to be held in trust by the association, subject to distribution only with approval of 80 percent of the former owners.

With regard to the claims against 2nd Half, 2nd Half further argued that the termination agreement "specifically limit[ed] the authority of the Trustee's power over the assets, and expressly reserve[d] to the owners the exclusive right to authorize a 'payment and disbursement plan' respecting all assets of the trust." CP at 341. 2nd Half asserted: "That include[d] the decision on whether to litigate or settle the claims which are supposed to be held in trust. . . . Absent agreement of the owners to prosecute this claim as part of the owner's 'payment and disbursement plan,' the Association ha[d] no authority under the trust agreement to prosecute this claim." CP at 341. 2nd Half explained that the owners had not yet had "a fair opportunity to meet and resolve the question of whether to settle or litigate the claims as they are entitled to do under the Termination Agreement." CP at 338.

2nd Half also contended that the trust agreement did not permit the payment of fees and costs to pursue the litigation absent agreement from the owners as required in the termination agreement. 2nd Half argued: "The Trust agreement requires that the trustee await a 'payment and distribution plan' and until such a plan authorizes the prosecution of this case, the Trustee is without any authority to put the claims at risk, *to run up Mr. Schafer's fees and costs prosecuting this claim, to unilaterally appropriate beneficiaries' assets to fund litigation, or to usurp the owners' rights to settle the claims by negotiation*." CP at 342 (emphasis added). "In short, the

former owners of units collectively own the claims being prosecuted here, and have not yet authorized anyone to proceed with resolution of various claims by filing of a lawsuit. Until properly authorized by the owners, this lawsuit should be dismissed without prejudice to refiling if refiling is even authorized by the former unit owners in their payment and distribution plan." CP at 342. 2nd Half also asked the court to stay the proceedings until the former owners authorized "the prosecution of these claims as part of a payment and disbursal plan" under the termination agreement. CP at 338. In sum, 2nd Half argued both that the claims made in the lawsuit were assets of the association, the resolution of which was subject to the approval required in the termination agreement, and that the fees and costs of pursuing the claims could not be paid from the sale proceeds without the owner approval required under the termination agreement.

The court stayed its decision pending an owner vote about whether to authorize the action. The association moved to lift the stay. The association conceded it had only 75 percent of the votes needed to authorize a payment and disbursement plan under the termination agreement. The association also requested, if the trial court decided not to lift the stay, that the court dismiss the case so the association could appeal the matter. In response, 2nd Half argued again that dismissal of the case was proper because the association did not have 80 percent of the votes required to pursue a cause of action under the termination agreement.

The trial court noted that the owners of 100 percent of the condominium units agreed to terminate their condominium and sell the entire project as an apartment complex. The owners memorialized their agreement in a written termination agreement that contained the notarized signatures of all owners and was recorded at the county auditor's office, as required by RCW 64.34.268. The termination agreement provided that the proceeds of the sale together with all

other assets of the association be placed in trust. And it provided that any disposition of assets was subject to a vote of the owners "to whom 80% of the votes of NOM Association are allocated." CP at 470. The court concluded that "to date, the owners have not authorized any action by a vote of the owners 'to whom 80% of the votes of NOM Association are allocated,'" and dismissed the complaint. CP at 470.

The association appeals. We affirm.

## ANALYSIS

### DISMISSAL UNDER CR 12(B)(6)

The association argues the trial court erred when it dismissed its complaint. We disagree.

A. Standard of Review

We review CR 12(b)(6) dismissals de novo. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830, 355 P.3d 1100 (2015). However, "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56." CR 12(c); *see also Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985). In support of an opposition to the motion to dismiss, the parties relied on declarations and attached documentary evidence. In its order granting 2nd Half's motion to dismiss, the superior court noted that it had "considered the files and records of the case" and relied on evidence, such as the termination agreement, to support its dismissal order. CP at 469-70. Accordingly, 2nd Half's CR 12(b)(6) motion should be treated as a motion for summary judgment.

"'We review a trial court's grant of summary judgment de novo.'" *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 410, 430 P.3d 229 (2018) (quoting *Scrivener v. Clark Coll.*, 181 Wn.2d

9

439, 444, 334 P.3d 541 (2014)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "We must also 'consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party.'" *Cornwell*, 192 Wn.2d at 410 (quoting *Scrivener*, 181 Wn.2d at 444).

We review standing and statutory interpretation de novo. *Knight v. City of Yelm*, 173 Wn.2d 325, 336, 267 P.3d 973 (2011); *Beal Bank, SSB v. Sarich*, 161 Wn.2d 544, 547, 167 P.3d 555 (2007). When a contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation and determination of the legal effect of a contract are questions of law that we review de novo. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 711-12, 334 P.3d 116 (2014); *Salvo v. Thatcher*, 128 Wn. App. 579, 584, 116 P.3d 1019 (2005).

B.     Standing and Real Party in Interest

As an initial matter, 2nd Half argues the association lacks standing to rescind or reform the contract because it was not a party to the termination agreement and has no beneficial interest in the outcome. 2nd Half also seems to assert the association is not a real party in interest. We disagree.

"'To have standing, one must have some protectable interest that has been invaded.'" *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 812, 225 P.3d 213 (2009) (quoting *Orion Corp. v. State*, 103 Wn.2d 441, 455, 693 P.2d 1369 (1985)). This court applies "a two-part test for determining whether a party has standing to bring a particular action." *Branson v. Port of*

*Seattle*, 152 Wn.2d 862, 875, 101 P.3d 67 (2004). "First, we ask whether the interest asserted is arguably within the zone of interests to be protected by the statute or constitutional guaranty in question." *Id*. Second, we ask "whether the party seeking standing has suffered from an injury in fact, economic or otherwise." *Id*. Both prongs must be met. *Id*. at 876. In addition, an organization "'has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Legion Post #149 v. Dep't of Health*, 164 Wn.2d 570, 595, 192 P.3d 306 (2008) (quoting *Hunt v. Apple Advert. Commc'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)).

The statute governing the powers of a condominium unit owners' association includes the association within its zone of interests by addressing the scope of the association's authority. RCW 64.34.268(4), .304(1)(d). Although the association was not a party to the termination agreement, the association's powers and duties, including its ability to file a lawsuit after execution of the termination agreement, are at issue. Therefore, we hold that the association's claims are within the zone of interests to be protected by the act and the agreement. *See Branson*, 152 Wn.2d at 875.

In addition, the association has alleged specific economic injuries on behalf of some of the unit owners. The economic injuries are redressable because, if the association prevails, it could obtain a money judgment. And the association's members would otherwise have standing to sue in their own right; the interests the association seeks to protect are germane to the organization's purpose as trustee of the remaining proceeds and all other assets; and the individual participation

11

of each injured party is not indispensable to the proper resolution of the case. *See Hunt*, 432 U.S. at 343; *Am. Legion*, 164 Wn.2d at 595. Accordingly, we conclude the association has standing.

2nd Half also cites to authorities regarding real parties in interest. *See State ex rel. Hays v. Wilson*, 17 Wn.2d 670, 672, 137 P.2d 105 (1943). To maintain a cause of action, a person must show that they have a real interest in the cause of action. *Kim v. Moffett*, 156 Wn. App. 689, 698, 234 P.3d 279 (2010). The interest "'must be a present, substantial interest, as distinguished from a mere expectancy, or future, contingent interest, and [the party] must show that [they] will be benefited by the relief granted.'" *Id.* (quoting *Hays*, 17 Wn.2d at 672). The association is a real party in interest because it has a present and substantial interest in having the scope of its authority resolved. The powers and duties of the association are directly addressed in RCW 64.34.268 and the termination agreement. Accordingly, we hold that to the extent that 2nd Half also argues the association is not a real party in interest, that argument fails.

C.     The Termination Agreement, Including Its Requirement for 80 Percent Approval for The Distribution of Assets, Is Consistent with Chapter 64.34 RCW and the Association's Governing Documents

The parties generally dispute the proper interpretation of chapter 64.34 RCW and the termination agreement. They also dispute whether the association, including its board of directors, continued to have all powers it had before termination or whether the association's powers were limited under chapter 64.34 RCW, the condominium's governing documents, or the termination agreement.

For the reasons discussed below, we conclude that the association's powers during termination of the condominium were limited by RCW 64.34.268, the association's governing

documents, and the termination agreement. The association did not have authority to proceed with this lawsuit without approval of at least 80 percent of the votes of the former owners.

When interpreting a statute, "[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). "Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007). "However, when the statute is ambiguous or there are conflicting provisions, 'we may arrive at the legislature's intent by applying recognized principles of statutory construction.'" *O.S.T. ex rel. G.T. v. BlueShield*, 181 Wn.2d 691, 696-97, 335 P.3d 416 (2014) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)).

1. Powers of the Association Under Chapter 64.34 RCW, the Condominium Bylaws, and the Condominium Articles of Incorporation

Generally, the association and its board of directors have certain powers and duties under the Condominium Act. RCW 64.34.304 establishes various powers of the association, "subject to the . . . [condominium] declaration." The declaration, in turn, provides that "[t]he Unit Owners covenant and agree that the administration of the Association shall be in accordance with the provisions of the Association Management Documents, which consist of this Declaration, the Articles of Incorporation, the Bylaws, and the Rules and Regulations, if any." CP at 228. The statute also gives the association the authority to adopt bylaws, as does the condominium declaration. RCW 64.34.304(1)(a).

RCW 64.34.308[3] defines the power of the association's board of directors. RCW 64.34.308 explains that "[e]xcept as provided in *the declaration*, *the bylaws*, subsection (2) of this section, or other provisions of this chapter, the board of directors shall act in all instances on behalf of the association." (Emphasis added.) Under subsection (2), the statute makes clear that board does not have termination powers and the condominium can only be terminated pursuant to RCW 64.34.268. The association's bylaws further provide that the board of directors has the authority to exercise the association's powers "not reserved to the membership by other provisions of [the] Bylaws, the Articles of Incorporation, or the Declaration or as set forth in Ch[apter] 64.32 [RCW], as currently enacted or hereafter amended." CP at 196. Thus, the powers of the association and its board of directors are governed by the statute, but subject to the association's governing documents.

Under the bylaws, certain actions cannot be taken by the board of directors. The board "shall <u>not</u> act on behalf of the Association to . . . take any action that requires the vote or approval of the [Unit] Owners [or] . . . terminate the Condominium." CP at 196. And although one of the enumerated powers in the statute is the power to institute, defend, or intervene in litigation for the benefit of the association or two or more of its members, RCW 64.34.304(1)(d), this power is subject to the condominium declaration, which incorporates restrictions in the association's other governing documents. RCW 64.34.304.

---

[3] The legislature amended RCW 64.34.308 in 2018. Because the relevant language has not changed, we cite to the current version of this statute.

2. Specific Termination Powers and Procedures Under RCW 64.34.268, the Bylaws, and the Articles of Incorporation

The association argues that nothing in the Condominium Act permits a group of non-director members/owners, even 80 percent of them, to limit the authority and responsibility of a board of directors to manage the corporation's assets and liabilities, even during the termination process. We disagree.

RCW 64.34.268 specifically governs condominium terminations. Under that statute, "a condominium may be terminated only by agreement of unit owners of units to which at least eighty percent of the votes in the association are allocated." RCW 64.34.268(1). "An agreement to terminate must be evidenced by the execution of a termination agreement or ratifications thereof, in the same manner as a deed, by the requisite number of unit owners." RCW 64.34.268(2).

"If any real property in the condominium is to be sold following termination, title to that real property, upon termination, vests in the association as trustee for the holders of all interests in the units. Thereafter, the association has all powers necessary and appropriate to effect the sale." RCW 64.34.268(4). "Until the sale has been concluded and the proceeds thereof distributed, the association continues in existence with all powers it had before termination. Proceeds of the sale must be distributed to unit owners and lienholders as their interests may appear, in proportion to the respective interests of unit owners as provided in subsection (7) of this section." RCW 64.34.268(4).

"Following termination of the condominium, the membership of the association shall consist of all of the unit owners at the time of termination entitled to distributions of proceeds under RCW 64.34.268 or their heirs, successors, or assigns." RCW 64.34.300. And "the proceeds of any sale of real property, together with the assets of the association, *are held by the association*

15

*as trustee for unit owners and holders of liens on the units and creditors of the association as their interests may appear.*" RCW 64.34.268(6) (emphasis added). "No such proceeds or assets may be disbursed to the owners until all of the creditors of the association have been paid or provided for." RCW 64.34.268(6). Notably, RCW 64.34.268 addresses what the *association* can do during the termination process. It does not grant or extend and powers to the association's *board of directors*. "Following termination, creditors of the association holding liens on the units, which were recorded or perfected under RCW 4.64.020 before termination, may enforce those liens in the same manner as any lienholder." RCW 64.34.268(6).

RCW 64.34.376 protects the rights of third persons dealing with the association in its capacity as trustee. Third persons are "fully protected in dealing with the association as if it possessed and properly exercised the powers it purports to exercise." RCW 64.34.376. This provision addresses only the rights of a third person dealing with the association in the association's capacity as a trustee and it does not otherwise affect the rights of owners or association members. *See* RCW 64.34.376.

The legislature did not define "trustee" in the Condominium Act. The dictionary defines "trustee" as "a person whether real or juristic to whom property is legally committed in trust: one holding legal title to property which he must administer for the benefit of a beneficiary." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2457 (1966). Similarly, *Black's Law Dictionary* 1553 (8th ed. 2004), defines "trustee" as "one who, having legal title to property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary." At the very least, a trustee is a fiduciary of the trust's beneficiaries and owes them the "highest degree of good faith, care, loyalty, and integrity." *Esmieu v. Schrag*, 88 Wn.2d 490, 498, 563 P.2d 203 (1977).

16

"'It is the duty of a trustee to administer the trust in the interest of the beneficiaries.'" *In re Wash. Builders' Benefit Tr.*, 173 Wn. App. 34, 63, 293 P.3d 1206 (2013) (quoting *Tucker v. Brown*, 20 Wn.2d 740, 768, 150 P.2d 604 (1944)). By providing that the association acts as the trustee of the association's assets (including the proceeds of the sale of the condominium property) during the termination process, the legislature imposed additional burdens on the association to act for the benefit of the former owners, which here included 2nd Half.

The association's governing documents also establish restrictions related to termination. As explained above, the association's statutory powers are expressly "subject to . . . the declaration." RCW 64.34.304. The declaration provides that the condominium can be terminated only with approval of 80 percent of the owners in compliance with the procedures established by statute. The declaration establishes that the president of the board of directors shall have the authority to file papers and take other actions necessary to effect the termination.

The declaration also provides that the association must act in accordance with the articles of incorporation and bylaws. The articles of incorporation in turn reiterate that the association may be dissolved with the written assent of the condominium owners "to which at least eighty percent of the votes in the association are allocated." CP at 183. "In the event of such dissolution, then, *unless otherwise authorized by law and by a vote of the members of the Association having at least eighty percent (80%) of the total votes in the Association*, the assets of the Association shall be owned by all members of the Association as tenants in common." CP at 183 (emphasis added). Thus, where the termination plan departs from tenancy in common, under the articles of incorporation, at least 80 percent of the total votes of the association must authorize the alternative plan. That is what occurred here, and the termination agreement provided for such approval.

In sum, RCW 64.34.268 deals specifically with termination of a condominium and says that following termination, the association may act on behalf of the owners only as trustee. *See* RCW 64.34.268(6). The association had a fiduciary duty to administer the sale of the property for the benefit of the former owners. The association held the assets of the association, including potential legal claims, as trustee for the owners. Further, the association's governing documents establish that both the termination and the post-termination resolution of assets that departs from tenancy in common must be approved by 80 percent of the votes of the association.

### 3. The Termination Agreement Was Consistent with the Condominium Act and the Condominium's Governing Documents

2nd Half argues the termination agreement created an express trust with the association as trustee. The association argues that the termination agreement created an implied, resulting, or constructive trust, but not an express trust. We conclude that regardless of what type of trust was created, the condominium statute and the association's governing documents support the termination agreement. Under the statute and the governing documents, the owners were entitled to require in their termination agreement that 80 percent of the votes of the association approve distribution of the association's assets.

Consistent with RCW 64.34.268, the termination agreement provided that "[t]he remaining proceeds of the sale and all other assets of [the] Association *will be held by it as trustee* for its creditors and the unit owners." CP at 119 (emphasis added). The language is plain on its face— the association clearly held the remaining proceeds of the sale and all other assets as trustee. But

given the requirements of the effect of the association's declaration and other governing documents, we need not determine specifically what type of trust was created.[4]

The association's powers were "subject to . . . the [condominium] declaration" under RCW 64.34.304, and the declaration requires compliance with the bylaws and articles of incorporation. CP at 228. The articles of incorporation established that the resolution of any termination that did not result in tenancy in common had to be approved by 80 percent of the votes of the association. Thus, the owners were entitled to restrict the association and its board of directors from distributing or otherwise disposing of its assets without that approval.

D.      The Termination Agreement Required 80 Percent Agreement for Any Disbursement of Trust Assets

The association argues that the trial court erred when it initially stayed the proceedings[5] and then dismissed its complaint based on the 80 percent approval requirement in the termination

---

[4] Generally, there are three basic categories of trusts. "'An express trust is one created by the act of the parties; and, where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists.'" *Wash. Builders*, 173 Wn. App. at 58 (quoting *Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n*, 133 Wn. App. 835, 845-46, 138 P.3d 638 (2006)). A resulting trust is one implied by law, and courts will presume a resulting trust exists by looking to the intention of the parties and the character of the transaction. *See Farrell v. Mentzer*, 102 Wash. 629, 633, 174 P. 482 (1918). A constructive trust is one that arises purely by equity in order to remedy, for example, fraud or concealment and is "'entirely independent of any actual or presumed intention of the parties.'" *Id.*

Express trusts are governed by chapter 11.98 RCW, but this chapter does not apply to resulting trusts or constructive trusts. RCW 11.98.009. An express trust is created only if the trustor has capacity to create a trust, indicates an intention to create the trust, and the trust has a definite beneficiary. RCW 11.98.011(1)(a)-(c).

[5] The association assigned error to the trial court's stay of proceedings, but provided no argument or authority as to why the trial court abused its discretion in staying the proceedings. We will not consider assignments of error unsupported by argument or authority. RAP 10.3(a)(6); *Olympic Stewardship Found. v. State Envtl. & Land Use Hr'gs Office*, 199 Wn. App. 668, 687, 399 P.3d

agreement. We conclude that the trial court appropriately relied on and interpreted the termination agreement to require 80 percent approval of the association members for the association to bring the claims in this complaint.

Generally, a condominium association may "[i]nstitute, defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium." RCW 64.34.304(1)(d). And RCW 64.34.268(4) provides that "[u]ntil the sale has been concluded and the proceeds thereof distributed, the association continues in existence with all powers it had before termination." But as described above, the association's powers were "subject to . . . the [condominium] declaration," which in turn requires compliance with the association's other governing documents. RCW 34.24.304; CP at 228.

Here, the relevant contract term is consistent with the articles of incorporation's requirement of 80 percent approval, and it states:

> *Pursuant to a payment and disbursement plan that is agreed to by the unit owners to which at least eighty percent of the votes in NOM Association are allocated*, NOM Association shall pay its creditors and disburse its remaining assets to the unit owners as their interests may appear, after which it shall dissolve.

CP at 119 (emphasis added).

Under the plain language of RCW 34.64.268 and the termination agreement, the association held the remaining proceeds of the sale and all other assets as trustee. Both parties seem to agree that we should construe any remaining post-termination legal claims as assets

---

562 (2017). Therefore, we decline to consider the association's assignment of error to the stay of proceedings.

subject to this obligation.[6] More importantly, proceeding with the lawsuit would ultimately require expenditures for litigation costs.

The termination agreement required 80 percent of unit owners to agree on any plan for "payment and disbursement" of the remaining proceeds or assets. CP at 119. Disbursement is "[t]he act of paying out money, commonly from a fund or in settlement of a debt or account payable. <dividend disbursement>. 2. The money so paid; an amount of money given for a particular purpose." BLACK'S LAW DICTIONARY 495 (8th ed. 2004). Thus, the agreement plainly precluded payment and disbursement of any remaining proceeds or assets until agreed to by the unit owners to which at least 80 percent of the votes were allocated. This would necessarily include payment and disbursement for the costs of litigation, which involves risk to trust assets. Simply put, hiring an attorney and proceeding with litigation costs money, which the association could not spend without the required level of owner approval.

The association notes that the termination agreement did not explicitly prohibit the association's board of directors from prosecuting an action, claim, or judicial proceeding in order to protect trust property. The association argues that other language in the termination agreement contemplated that the association would retain its existing authority to govern assets, including the claim against 2nd Half, until all disbursements had been completed. However, read as a whole, the termination agreement ultimately required owner approval of all "payments." Owner approval was required to commit resources that the association held as trustee. The association proceeded

---

[6] *See also* Robert J. Rhee, *The Effect of Risk on Legal Valuation*, 78 U. COLO. L. REV. 193, 254 (2007) (arguing that a lawsuit is fundamentally an asset).

with the lawsuit (and as a result it ultimately paid its attorney over $100,000 in trust assets as attorney fees)[7] without authority under the termination agreement.

We hold the trial court did not err when it stayed the proceedings and then dismissed its complaint—80 percent of the association's voting members had not agreed to a plan of payment and disbursement that involved litigating the claims alleged in the association's complaint.

E.      Principles of Equity

The association argues that the trial court erred when it ignored principles of equity by disallowing the association's action against 2nd Half and its associates unless authorized by 80 percent of the association's voting members. We disagree.

RCW 64.34.070 provides that the "principles of law and equity" apply, including "estoppel, fraud, misrepresentation, duress, coercion, mistake, receivership, substantial performance, . . . to the extent they are not inconsistent" with the Condominium Act. In addition, every contract or duty governed by the Condominium Act imposes an obligation of good faith in its performance or enforcement. RCW 64.34.090. The remedies provided must be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed. RCW 64.34.100.

The association claims that under equitable principles, it should not be deprived of its opportunity to pursue meritorious claims. It argues that giving 2nd Half veto power over such claims is inconsistent with the good faith requirement of RCW 64.34.090. This argument ignores that the termination agreement was negotiated to impose the restrictions that the association now

---

[7] We note again that 2nd Half does not, on appeal, discuss any remedy for disbursements made in violation of the termination agreement because, it says, the trial court has not addressed that issue.

complains about. The owners agreed to the addition of a clause providing that the sale would occur "free of any liens claimed by [the association]," eliminating the association's right to enforce its existing liens against 2nd Half for nonpayment of association dues and assessments upon the sale. CP at 119. And the owners agreed to the clause requiring 80 percent owner approval of any payment from the proceeds of the sale, a rate that would obviously require 2nd Half approval. "As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 570, 807 P.2d 356 (1991).

The association next argues that Dawson collusively obtained an inflated payoff from escrow. It claims this amounted to bad faith. But the termination agreement provided that the escrow agent would pay from the proceeds of the sale amounts due to holders of deeds of trust. The association cites to no law establishing that the payoff amount was illegal and it agreed to proceed with the sale even after the board understood the payoff amount. On this record, there is no evidence that the amount Dawson claimed under his deed of trust amounted to bad faith.

The association further argues the contract is not enforceable if it is based on a unilateral or mutual mistake or if it is shown to be unconscionable or inequitable. Specifically, the association argues it did not intend for the 80 percent approval requirement to limit the pursuit of its claims against 2nd Half, and it would be unfair for us to enforce that term against it.

"A mistake is a belief not in accord with the facts." *Simonson v. Fendell*, 101 Wn.2d 88, 91, 675 P.2d 1218 (1984). "Unilateral mistake entitles a party to reform a contract only if the other party engaged in fraud or inequitable conduct." *Associated Petroleum Prods. Inc. v. Nw. Cascade, Inc.*, 149 Wn. App. 429, 437, 203 P.3d 1077 (2009). "A party has engaged in fraud or inequitable

23

conduct if it conceals a material fact that it has a duty to disclose to the other party." *Id*. at 438. Here, 2nd Half did not conceal any of the contract terms, which all appeared on the face of the written termination agreement. The association has argued that Dawson improperly concealed, until the last minute, the amount owed under his deed of trust. But the association cites to no law that makes disclosure of that amount required before a property can be listed. The owners and the association were aware of the amount pre-sale, and they allowed the sale to proceed with an understanding of what that payoff amount would be. The court did not err when it concluded that even assuming all of the association's alleged facts are true, the association had not established that 2nd Half and others committed fraud.

"A party seeking to rescind an agreement on the basis of mutual mistake must show by clear, cogent and convincing evidence that the mistake was independently made by both parties." *Simonson*, 101 Wn.2d at 91. Here, 2nd Half argues it clearly intended to include the 80 percent owner approval language in the contract. Br. of Resp't at 32-34 ("Without the provision vesting the owners directly with control over the plan of payment and disbursement of assets, 2nd Half would not [have] agreed to the termination and sale"). Therefore, there is no clear, cogent and convincing evidence that the mistake was independently made by both parties, and this argument fails.

The association also argues that the termination agreement is unconscionable. "[S]ubstantive unconscionability involves cases 'where a clause or term in the contract is . . . one-sided or overly harsh.'" *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 519, 210 P.3d 318 (2009) (alteration in original) (quoting *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344, 103 P.3d 773 (2004)). But such unfairness must be truly apparent: "'[s]hocking to the conscience,'

24

'monstrously harsh,' and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability.'" *Torgerson*, 166 Wn.2d at 519 (quoting *Adler*, 153 Wn.2d at 344-35). The 80 percent term is contemplated in the statute governing condominium termination. *See* RCW 64.34.268. It was also contained in the association's articles of incorporation and bylaws. Parroting the term requiring 80 percent of the votes of the unit owners to agree to a plan of payment and disbursement hardly shocks the conscience. Although the termination agreement essentially gives 2nd Half veto power over any plan of payment and disbursement, this was an openly negotiated term that was not unconscionable. Moreover, this contract term similarly gave the Rankoses, who owned three units, veto power.

In sum, "[t]he 'touchstone of contract interpretation is the parties' intent.'" *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 134, 317 P.3d 1074 (2014) (quoting *Realm, Inc. v. City of Olympia*, 168 Wn. App. 1, 4-5, 277 P.3d 679 (2012)). This contract was negotiated and signed by all of the unit owners, and its language is plain. The 80 percent term was not included in the first draft of the termination agreement, which no unit owner signed, but later included in the final draft of the agreement, which all of the unit owners signed. Therefore, the association's arguments about mistake, unconscionability, and inequity fail.

We hold that the trial court did not ignore principles of equity when it dismissed the association's complaint.

ATTORNEY FEES

Both parties request attorney fees and costs on appeal under the Condominium Act, the bylaws, and articles of incorporation. We decline to grant either party attorney fees and costs.

No. 51616-1-II

We affirm and decline to award attorney fees and costs to either party.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, J.

We concur:

_____
Melnick, P.J.

_____
Sutton, J.