IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| GLACIER NORTHWEST, INC.<br>d/b/a CALPORTLAND,<br><br>                      Appellant,<br><br>      v.<br><br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS LOCAL UNION NO. 174<br><br>                    Respondent. | No. 79520-1-I<br><br>ORDER DENYING MOTION FOR<br>RECONSIDERATION,<br>WITHDRAWING OPINION, AND<br>SUBSTITUTING OPINION |

Appellant, Glacier Northwwest, Inc., has filed a motion for reconsideration of the opinion filed in the above matter on August 31, 2020. Respondent, International Brotherhood of Teamsters, Local Union NO. 174, has filed a response to appellant's motion. The court has determined that appellant's motion for reconsideration should be denied, the opinion should be withdrawn, and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied. It is further

ORDERED that the opinion filed on August 31, 2020, is withdrawn and a substitute opinion be filed.

_Andrus, A.C.J._

_Mann, C.J._                    _Dwyer, J._

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| GLACIER NORTHWEST, INC. d/b/a CALPORTLAND, | ) ) ) | No. 79520-1-I |
| Appellant, | ) ) | AMENDED PUBLISHED OPINION |
| v. | ) ) ) | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL UNION NO. 174 | ) ) ) | |
| Respondent. | ) ) ) | |

ANDRUS, A.C.J. – Glacier Northwest Inc., who employs drivers represented by the International Brotherhood of Teamsters Local Union No. 174 (Union), filed this lawsuit against the Union for intentional destruction of property, misrepresentation, and tortious interference with a business relationship, relating to the Union's conduct during and immediately after an August 2017 strike. The trial court initially dismissed Glacier's property destruction claims, concluding they were federally preempted. It subsequently dismissed the misrepresentation and tortious interference claims on summary judgment, concluding Glacier failed to present a genuine issue of material fact on the elements of justifiable reliance or proximate cause.

Citations and pin cites are based on the Westlaw online version of the cited material.

We reverse the dismissal of Glacier's claims for intentional destruction of property because those claims are based on conduct neither actually nor arguably protected under section 7 of the National Labor Relations Act.[1] We affirm the dismissal of Glacier's remaining claims.

## FACTS

Glacier sells and delivers ready-mix concrete throughout Washington State.[2] Its 80 or 90 truck drivers, who work out of Glacier's facilities in Seattle along the Duwamish River, and in Kenmore and Snoqualmie, are represented exclusively by the Union. Glacier's lawsuit was based on two instances of alleged Union misconduct at the beginning of a strike on August 11, 2017, and on the day the strike ended on August 18, 2017.

## August 11 Work Stoppage

Glacier alleged that in the early morning hours of August 11, 2017, Glacier and its drivers began the process of batching and delivering concrete to Glacier customers. "Batching" is the process of preparing concrete for the immediate delivery to a customer, and generally requires measuring and mixing different ingredients (cement, sand, aggregate, admixture, and water) pursuant to a customer's specifications. Glacier places these raw materials into a hopper and blends them together. Once it is batched, Glacier discharges the concrete into a ready-mix truck for immediate delivery to a customer's project site. The trucks are specifically designed to maintain the integrity of the batched concrete in a revolving drum during transport.

---

[1] 29 U.S.C. § 157.
[2] Glacier Northwest Inc. does business as CalPortland.

Glacier further alleged that concrete is a perishable product because once at rest, it begins to harden immediately and can begin to set within 20 to 30 minutes. Once the raw materials are batched, the concrete cannot be saved for another day and must be delivered, poured, and finished. As a result, Glacier's drivers have a limited amount of time in which to deliver and pump the concrete or it becomes useless. If the drivers do not deliver the concrete within this short time period, the concrete is rendered unusable because the concrete's physical condition materially changes, and it eventually hardens. And if the batched concrete remains in the revolving drum of the ready-mix truck beyond its useful life span, the concrete will harden inside the revolving drum and cause significant damage to the truck. Once concrete starts to set, it begins to thicken, placing pressure on the hydraulic system of the rotating barrel of the truck. If a driver stops the rotation of the drum, the setting process commences and the concrete starts to harden inside. Glacier alleged the Union representatives and Glacier's drivers all knew of this perishable nature of batched concrete.

Glacier alleged that shortly before 7:00 a.m., on the morning of August 11, 2017, Union agents were physically present at Glacier's Seattle facility and observed drivers loading batched concrete onto its trucks. Glacier's collective bargaining agreement (CBA) with the Union had expired as of July 31, 2017, and the Union was in the process of negotiating a replacement CBA with Glacier and other concrete companies. Glacier further alleged that once the Union representatives knew there was a substantial volume of batched concrete in Glacier's barrels, hoppers, and ready-mix trucks, they called for a work stoppage.

- 3 -

Glacier alleged that the Union intentionally timed this cessation of work to ensure the destruction of all of the batched concrete.

According to Adam Doyle, Glacier's dispatch coordinator, at the time the Union called the strike, Glacier had mixer trucks already on job sites delivering concrete, drivers on the road with fully loaded trucks, drivers in the yard waiting to have their trucks loaded from Glacier barrels and hoppers, and drivers in the yard with fully loaded trucks ready to depart. Doyle notified the drivers that they were obligated to finish any job that Glacier had started. Normally, when drivers return to the yard after delivering concrete, they offload any leftover concrete into a "reclaimer" or into a form to make ecology blocks. They then rinse out the drum and return to the line to take on another load.

But on August 11, the drivers all brought their mixer trucks back to the yard between 7:00 a.m. and 7:45 a.m. Justin Denison, Glacier's ready-mix concrete manager, testified that some of the drivers, who were on their way to jobsites with trucks loaded with 9 to 10 cubic yards of concrete when the Union called the strike, returned their trucks to Glacier's Duwamish facility without delivering the concrete. He testified that at least 16 drivers came back with fully loaded trucks, and 9 drivers abandoned them in Glacier's yard without notice to Glacier. Seven drivers parked their trucks, notified Glacier of their return, and sought instructions for dealing with the concrete. Denison described the scene:

> I was present in the yard when the loaded trucks came rolling back in on August 11. . . . It was complete chaos. We had to offload the concrete from the barrels before it "set up." We had to dispose of the concrete in a timely manner to avoid costly damage to the mixer trucks and in a manner so as not to create an environmental disaster. We had to reorganize material storage bunkers into which we offloaded the concrete. We had to deal with settling ponds, treatment

of material and filter presses to handle hundreds of cubic yards of concrete. It took us 5 hours to properly handle and clean-up the mess created by the drivers.

Glacier contended it took emergency measures to offload the hardening concrete into hastily constructed bunkers in an environmentally safe manner, and quickly washed out the trucks to prevent damage to them. But it was unable to save any of the concrete. Glacier had to subsequently bring in excavation equipment and trucks to break up the fully hardened concrete and haul it to a disposal site.

Glacier initially issued disciplinary letters to the 16 drivers who returned their loaded trucks to Glacier's facility for abandoning the trucks and violating Glacier's work rules and safety rules by deliberately putting Glacier's business in imminent harm. When Glacier's management learned that 7 of the drivers had given Glacier advance notice of the strike and their intent to return loaded trucks to Glacier's facility, Glacier withdrew the warning letters to these drivers.

### August 19 Mat Pour

GLY Construction, a general contractor, had subcontracted with Glacier to supply concrete for a commercial project in the South Lake Union neighborhood of Seattle (the Vulcan Project). When the Union called the August 11 strike, GLY had a large mat pour,[3] as part of the Vulcan Project, scheduled for Saturday, August 12, 2017. Glacier canceled this job due to the strike.

---

[3] A "mat pour" involves the delivery of concrete by several trucks, one after another, to pour a concrete foundation for a large commercial building. The work requires a substantial labor force including dispatchers, laborers, batch plant personnel, truck drivers, GLY personnel, and City of Seattle inspectors and police. Because a mat pour requires street closures, having a sufficient number of drivers to deliver concrete is essential.

In the early morning hours of August 18, 2017, the Union and Glacier agreed to a successor CBA covering August 1, 2017 through July 31, 2021. Around 11 a.m. that morning, the Union called a meeting with the drivers, during which they voted to approve the CBA (August 2017 CBA).[4] Immediately after the August 18 ratification vote, the Union drafted a press release announcing the vote, and posted it on the Union's website and Facebook page within a couple hours of the meeting. This release said that the Glacier strike was over and "everyone is now back to work."

That same day, GLY Construction employee Dane Buechler called Ted Herb, the president of the company, to inform him that the Union had ratified a new CBA with Glacier. Buechler wanted to proceed with the Vulcan Project mat pour after midnight that night but was unsure if the Glacier drivers would respond to work that night. Glacier managers had heard rumors that the drivers had been instructed not to answer phones for Saturday work. Glacier's vice president and general manager, Melanie O'Regan, was unwilling to mobilize for the mat pour without reason to believe the drivers would show up because Glacier would then be responsible for both Glacier's losses and GLY's mobilization costs and potentially liquidated damages.

Buechler asked Herb to call the Union's agent, Rick Hicks, with whom Herb had previously discussed the complexities of this concrete job, to find out if the rumors were true. Greg Mettler, Glacier's ready-mix sales manager, also spoke to

---

[4] Union Secretary-Treasurer Rick Hicks signed the formal agreement on September 19, 2017, and Glacier Director of Industrial Relations Brian Sleeper signed on November 20, 2017. But the parties do not dispute that the drivers approved it before noon on August 18, 2017.

Herb that afternoon and learned Herb intended to call Hicks to discuss the concerns about whether drivers would show up for the mat pour.

Herb called Hicks around 12:35 p.m. that afternoon, and Hicks confirmed the Union had approved the successor CBA. Herb told Hicks that GLY wanted to reschedule the Vulcan Project mat pour for shortly after midnight that night, on August 19. He recounted his conversation with Hicks:

> I told Mr. Hicks: "Dane is trying to reschedule the mat pour for tonight and there's some concern about whether it will be properly serviced. So, I have been asked to call and get a response and some information on what will happen." I asked: "I've been asked by Dane to call you and get verification; will you service the mat pour or not?"

Herb testified that Hicks responded to his question by stating that "the drivers have been instructed to respond to dispatch." Herb asked the same question a second time and Hicks "responded exactly the same way both times." Hicks denied making this statement to Herb.

Herb communicated the contents of this conversation to O'Regan and Mettler around 1 p.m. They interpreted Hicks's statement that "the drivers have been instructed to respond to dispatch" to mean that the Union had instructed the drivers to show up to work the mat pour. O'Regan testified that she reasonably relied on Hicks's statement in making the decision to proceed that night to mobilize to the job. But no one from Glacier spoke to Hicks directly.

Glacier decided to proceed with the mat pour. Glacier dispatcher Dirck Armitage testified that generally, for weekend work, he will call drivers individually to inform them of their start time and to tell them to check a "call-out recording" listing all drivers' start times for that weekend work. On August 18, Armitage began calling drivers around 1:22 p.m. By 3:42 p.m., he had posted the call-out recording

with start times. Armitage testified that he listened to the call-out recording to ensure it was functional, per standard practice, at 3:47 p.m. The last round of first calls ended at 4:01 p.m., and dispatchers called each driver a second time, beginning at 4:15 p.m.

Armitage and a second dispatcher spoke to some drivers personally and left voice mail messages with others. According to Armitage's dispatch notes, 12 of the drivers answered this phone call, and the majority of those drivers indicated they would work the mat pour. Approximately 39 drivers did not answer.

The earliest assigned start time for the mat pour was at 12:30 a.m., and the latest start time was at 7:00 a.m., with the majority of drivers scheduled to arrive between 12:30 a.m. and 1:05 a.m. At 12:45 a.m. on August 19, Glacier employees realized they had a problem. By 1:00 a.m., only 11 or 12 drivers had arrived for the mat pour. Shortly before 1:15 a.m., only 17 of the 40-50 drivers needed showed up for the mat pour, while another 5 drivers indicated they were on their way. Knowing they could not complete the mat pour with only 22 drivers, Glacier cancelled the pour at 1:15 a.m.

On August 23, 2017, Glacier sent disciplinary warning letters to the 39 drivers who did not show up for the August 19 mat pour, contending the failure to report to work violated Glacier's work rule prohibiting the participation "in any interruption of work or production."

### Procedural History

Glacier commenced this suit on December 4, 2017, alleging six separate causes of action. Glacier's first three claims related to the August 11 work stoppage: (1) wrongful sabotage and destruction of concrete, (2) intentional

interference of Glacier's performance of its business relationships, and (3) civil conspiracy to commit sabotage and to destroy Glacier's concrete. Glacier's remaining claims related to the August 19 mat pour: (4) fraudulent misrepresentation and concealment, (5) negligent misrepresentation, and (6) intentional interference with Glacier's performance of the GLY contract.

On December 15, 2017, the Union filed a grievance against Glacier with the National Labor Relations Board (NLRB), alleging Glacier had violated the National Labor Relations Act (NLRA), 29 U.S.C. §§ 157-158, by retaliating against the Union drivers for engaging in a lawful strike, retaliating against drivers for not showing up for work in August 19, and filing "an objectively baseless federally preempted lawsuit" against the union in state court.

In January 2018, the Union moved to dismiss Glacier's claims under CR 12(b)(1) and 12(b)(6), arguing that all of Glacier's claims were preempted under San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959). It maintained that under the Garmon preemption doctrine, state courts may not adjudicate any claims where the conduct at issue is actually or arguably protected under section 7, or actually or arguably prohibited under section 8 of the NLRA. 29 U.S.C. § 157-158.[5] It argued the August 11 work stoppage was lawful concerted activity and any alleged misrepresentations that

---

[5] 29 U.S.C. § 157 provides in pertinent part, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." And 29 U.S.C. § 158(b)(3) makes it an unfair labor practice for a labor union or its agents "to refuse to bargain collectively with an employer" when that union is the certified representative of that employer's employees.

workers would return to work were arguably covered by section 8(b)(3) of the NLRA, which prohibits dishonesty by a labor union during the bargaining process.

The trial court dismissed the three claims arising from the August 11 events. It concluded that the strike, in which Glacier drivers returned their loaded trucks to Glacier's Seattle facility, was protected work stoppage activity. The court acknowledged that while the economic losses from the strike were unfortunate, such losses did not "touch[] an interest so deeply rooted in local feeling and responsibility, such as vandalism or violence, that it clearly falls outside the protection of [the Act]." The trial court, however, declined to dismiss the three claims related to the August 19 mat pour. Accepting Glacier's factual allegations as true, the trial court concluded the alleged misrepresentations did not arguably fall within the scope of section 8 of the NLRA.

In October 2018, after conducting discovery, the Union moved to dismiss Glacier's remaining claims on summary judgment. The Union asked the court to dismiss the fraud and negligent misrepresentation claims, arguing that Glacier unreasonably relied on Hicks's alleged statement because Hicks did not say drivers would work the mat pour and only a handful of drivers actually answered the dispatch call before Glacier chose to proceed with it. The Union also maintained Glacier's reliance was unjustified because the Union could not require any drivers to work that night because Glacier had not given the drivers sufficient notice as required by the August 2017 CBA. The Union sought the dismissal of the remaining tortious interference claim, arguing GLY did not end its contractual relationship with Glacier after the drivers failed to show for the mat pour. GLY rescheduled and completed the mat pour later in August 2017. Finally, the Union

argued the trial court lacked jurisdiction to adjudicate these claims because they were preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.[6]

On November 16, 2018, the trial court granted the Union's motion and dismissed Glacier's remaining claims. Glacier appeals the dismissal of two of its claims arising from the August 11 work stoppage and all three claims arising from the August 19 mat pour.[7]

## ANALYSIS

Glacier raises three main arguments on appeal. First, it argues that the trial court erred when it concluded that Glacier's intentional destruction of property claims arising from the August 11 work stoppage were preempted under Garmon. Second, it argues that the trial court erred in its alternate conclusion that Glacier's misrepresentation claims were preempted by section 301 of the LMRA. Third, it maintains that the trial court erred when it dismissed its misrepresentation and tortious interference claims on summary judgment, contending there are issues of fact needing to be resolved at a trial.

---

[6] 29 U.S.C. § 185(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

This provision of the LMRA has been held to preempt state law claims based directly on rights created by a CBA as well as claims that are "substantially dependent on an interpretation of a collective bargaining agreement." Beals v. Kiewit Pac. Co., 114 F.3d 892, 894 (9th Cir. 1997).

[7] Glacier does not appeal the dismissal of its tortious interference claim arising out of the August 11 work stoppage.

We conclude the trial court erred in dismissing Glacier's August 11 work stoppage claims but did not err in dismissing the claims relating to the August 19 mat pour.

A.  Garmon Preemption of Glacier's Property Destruction Claims

Glacier contends the trial court erred in concluding Glacier's intentional destruction of property claims were preempted under Garmon.  We agree.

1.  Standard of Review

This appeal arises out of a dismissal on the Union's motion to dismiss for lack of subject matter jurisdiction under CR 12(b)(1) and failure to state a claim under CR 12(b)(6).  A motion to dismiss under CR 12(b)(1) may be either facial or factual.  Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp., 172 Wn. App. 799, 806, 292 P.3d 147 (2013).  In a facial challenge, the sufficiency of the pleadings is the sole issue.  Id. at 806-07.  In a factual challenge, the trial court may weigh evidence to resolve disputed jurisdictional facts.  Id. at 807.  In this case, the Union's challenge to the trial court's jurisdiction appears facial, in that it relied on the allegations in Glacier's complaint but it also submitted evidence relating to the unlawful labor practice complaint it filed with the NLRB.  In response, Glacier submitted, with the trial court's permission, declarations filed with the NLRB.  Although the Union did not concede any factual allegations made by Glacier in these pleadings, it did not offer evidence to dispute them.  Thus, although the trial court reviewed evidence in addition to the complaint, in rendering its determination it does not appear it had to resolve any disputed jurisdictional facts.  We thus assume for our analysis that the Union's motion was a facial challenge to subject matter jurisdiction.

When a court rules on a facial challenge, based on the complaint alone or the complaint supplemented by undisputed facts gleaned from the record, the existence of subject matter jurisdiction is a question of law that we review de novo. Id.; see also Ricketts v. Bd. of Accountancy, 111 Wn. App. 113, 116, 43 P.3d 548 (2002) (motion to dismiss for lack of subject matter jurisdiction is reviewed de novo). The party asserting subject matter jurisdiction bears the burden of proof on its existence. Outsource Servs., 172 Wn. App. at 806.

The Union's motion also invoked CR 12(b)(6). We review dismissals under CR 12(b)(6) de novo. FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014). Dismissal for failure to state a claim is appropriate only if it appears beyond a reasonable doubt that no facts exist that would justify recovery. Cutler v. Phillips Petrol. Co., 124 Wn.2d 749, 755, 881 P.2d 216 (1994). Under this rule, the plaintiff's allegations are presumed to be true and a court may consider hypothetical facts not part of the formal record. Id.

In this case, the trial court concluded as a matter of law that Glacier's state law claims were preempted by federal law. Whether a claim is preempted is a question of law reviewed de novo. McKee v. AT&T Corp., 164 Wn.2d 372, 387, 191 P.3d 845 (2008); Wal-Mart Stores, Inc. v. United Food & Commercial Workers Int'l Union, 190 Wn. App. 14, 21, 354 P.3d 31 (2015).

2. Garmon Preemption

In Garmon, a union sought recognition as the representative of nonunion employees of lumber suppliers. 359 U.S. at 237. The suppliers refused to recognize the union, and the employees began a peaceful picket at the suppliers' places of business. Id. A California state court enjoined the picketing and awarded

- 13 -

damages for losses sustained by the companies. Id. at 237-38. The United States Supreme Court held that the suppliers' state law claims were preempted by federal labor law. Id. at 245.

Under what has become known as the Garmon preemption doctrine, when an activity is arguably subject to section 7 or section 8 of the NLRA, "the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Id.. And it held that state courts should not determine whether conduct is arguably protected by the NLRA. Id. at 244. The court stated, "In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction." Id. at 246.

Here, we have a clear determination from the NLRB that the intentional destruction of property during a lawful work stoppage is not protected activity under section 7 of the NLRA. "Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States." Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n, 427 U.S. 132, 136, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976) (emphasis added); see also Cranshaw Constr. of New England, LP v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, 891 F. Supp. 666, 674 (D. Mass. 1995) (vandalism or the intentional destruction of property during a strike is not protected activity under the NLRA).

Moreover, the NLRB, as well as reviewing federal courts, has explicitly stated that workers who fail to take reasonable precautions to prevent the destruction of an employer's plant, equipment, or products before engaging in a work stoppage may be disciplined by an employer for this conduct. In Marshall Car Wheel & Foundry Co., 107 N.L.R.B. 314, 315 (1953), the Board stated:

> [T]he right of certain classes of employees to engage in concerted activity is limited by the duty to take reasonable precautions to protect the employer's physical plant from such imminent damage as foreseeably would result from their sudden cessation of work. We are of the opinion that this duty extends as well to ordinary rank-and-file employees whose work tasks are such as to involve responsibility for the property which might be damaged. Employees who strike in breach of such obligation engage in unprotected activity for which they may be discharged or subjected to other forms of discipline affecting their employment conditions.

The Fifth Circuit affirmed this general statement of the law. Nat'l Labor Relations Bd. v. Marshall Car Wheel & Foundry Co., 218 F.2d 409, 413 (5th Cir. 1955). The court agreed with the NLRB that the workers' conduct was unprotected activity because "the striking employees intentionally chose a time for their walkout when molten iron in the plant cupola was ready to be poured off, and . . . a lack of sufficient help to carry out the critical pouring operation might well have resulted in substantial property damage and pecuniary loss" to the employer. Id. at 411 (footnote omitted). The employer was able to prevent this damage from occurring by using employees who refused to honor the strike and its supervisory staff. Id. The court held that because the union "deliberately timed its strike without prior warning and with the purpose of causing maximum plant damage and financial loss" to the employer, the NLRB had no authority to compel the employer to

reinstate the employees who participated in, authorized, or ratified the illegal activity. Id. at 413.

The NLRB's decision in Marshall Car Wheel has been recognized by federal courts and the NLRB for decades. See Int'l Protective Servs., Inc., 339 N.L.R.B. 701, 702 (2003) (striking employees' failure to take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable harm is not protected activity).[8] In Boghosian Raisin Packing Co., 342 N.L.R.B. 383 (2004), the NLRB determined that the employees, who walked off the job without protecting the employers' perishable products from spoilage, had engaged in unprotected activity under the NLRA:

> The Union apparently decided on the evening of September 30 to strike the next day, however rather than having employees not report for work, the Union did the opposite. The employees reported and began working, then at 7:15 a.m. word was passed to strike. While the employees did a mini cleanup, of the type required when they went on a short break, there is no question that by leaving for the day, there was product damage. . . . And there can be little question that the product damage was intentional. In such a situation, the action of employees is unprotected.
>
> The Board has long held that employees have the duty to take reasonable precautions when striking in order to avoid damage to the company's property. Necessarily a strike will cause some economic loss to an employer, as well as to the employees. But damage to the company's property goes beyond such loss and where strikers deliberately time their strike to cause product damage,

---

[8] The NLRB said:

> Both the Board and the courts recognize that the right to strike is not absolute, and section 7 [of the NRLA] has been interpreted not to protect concerted activity that is unlawful, violent, in breach of contract, or otherwise indefensible. The Board has held concerted activity indefensible where employees fail to take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger due to sudden cessation of work.

Int'l Protective Svcs., 339 N.L.R.B. at 702 (alteration in original) (citation omitted) (quoting Bethany Med. Ctr., 328 N.L.R.B. 1094, 1094 (1999)).

then their activity is unprotected for which they can be disciplined or discharged.

Id. at 396-97 (emphasis added) (citation omitted).

Glacier's allegations are similar to those of Boghosian Raisin. Glacier alleged that "[o]n August 11, 2017, the Union and some or all of its officers, employees, and members consciously acted together . . . to sabotage, ruin and destroy Glacier's batched concrete." It further alleged the Union failed to take reasonable precautions to protect Glacier's equipment, plant, and batched concrete from "foreseeable imminent danger" resulting from the Union's sudden cessation of work. Glacier also claimed the Union drivers "knew their August 11, 2017 conduct was certain to, or substantially certain to, destroy or so materially alter the physical condition of Glacier's batched concrete as to deprive Glacier of possession or use of the batched concrete."

Because the trial court dismissed Glacier's claims on a CR 12(b)(1) and (b)(6) motion, we accept these allegations as true. And if we assume the Union ordered Glacier's truck drivers to wait to stop work until Glacier had batched a large amount of concrete and loaded it into the drivers' waiting trucks, and the Union did so with the intention of causing maximum product loss to Glacier, this conduct was clearly unprotected under section 7 of the NLRA. Because the conduct Glacier has alleged here is neither actually nor arguably protected activity, there is no Garmon preemption. The trial court erred in concluding to the contrary.

B. LMRA Preemption of Glacier's Remaining Claims

Glacier next contends the trial court erred in dismissing Glacier's fraudulent and negligent misrepresentation claims relating to the August 19 mat pour, concluding the claims were preempted by section 301 of the LRMA.

1. Standard of Review

We review summary judgment rulings de novo. Rhoads v. Evergreen Utils. Contractors, Inc., 105 Wn. App. 419, 423, 20 P.3d 460 (2001).

2. Section 301 Preemption

Section 301 of the LMRA provides exclusive federal court jurisdiction over claims that an employer or union violated a CBA. Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 863, 93 P.3d 108 (2004). "LMRA supremacy 'ensure[s] uniform interpretation of collective-bargaining agreements, and thus . . . promote[s] the peaceable, consistent resolution of labor-management disputes.'" Id. (alterations in original) (quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 404, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988)). Section 301 preemption occurs when the state claim is " 'inextricably intertwined with consideration of the terms of the labor contract,' " id. (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985)), and application of state law " 'requires the interpretation of a collective-bargaining agreement,' " id. (quoting Lingle, 486 U.S. at 413).

Glacier's claims are not based on the CBA but instead arise in tort. Our Supreme Court has recognized that "[a] different issue arises . . . when a plaintiff brings a claim that does not sound in breach of contract, but nevertheless arguably implicates the CBA." Commodore v. Univ. Mech. Contractors, Inc., 120 Wn.2d

120, 126, 839 P.2d 314 (1992). The Union contends Glacier's tort claims implicate the CBA because its defense is based on specific provisions of that agreement. The Supreme Court, however, held in Commodore that such an indirect connection to a CBA does not trigger section 301 preemption. Id. at 139.

In Commodore, the trial court concluded a union member's claims for defamation, outrage, racial discrimination, and tortious interference with a business relationship against his employer were preempted by section 301 of the LMRA. Id. at 123. On review, our Supreme Court adopted the "Marcus model,"[9] which states that "[a] state statutory or common law claim is independent of the CBA–and therefore should not be preempted by section 301–if it could be asserted without reliance on an employment contract." Id. at 129 (emphasis omitted). The court held that section 301 preemption occurs only in cases involving claims of breach of contract, claims of breach of the implied covenant of good faith and fair dealing, and claims based directly on violation of the CBA. Id. at 129-30. The court concluded that the union member's tort claims were not based on any violation of the CBA and thus not preempted by section 301. Id. at 139.

Here, Glacier alleged that the Union fraudulently or negligently misrepresented the Union's directive to its members regarding reporting to work for the mat pour. Glacier's claim is based on Hicks's statement to Herb that the drivers would "respond to dispatch." This claim is not directly based on any violation of the August 2017 CBA—that CBA did not define the phrase "respond to

---

[9] The "Marcus model" was based on a 1989 law review note in the *Yale Law Journal* by Stephanie Marcus, which interpreted the 1988 Supreme Court decision in Lingle. Commodore, 120 Wn.2d at 126; see also Stephanie R. Marcus, The Need for a New Approach to Federal Preemption of Union Members' State Law Claims, 99 YALE L.J. 209 (1989).

dispatch." Determining whether Hicks's statements were misrepresentations would not have required the trial court to interpret the August 2017 CBA. Although the Union raised provisions of the August 2017 CBA to undercut the reasonableness of Glacier's reliance on Hicks's statement, there was no dispute as to the meaning of these provisions. Under Commodore, Glacier's fraudulent and negligent misrepresentation claims can be resolved by tort law, and the trial court did not need to resolve any disputes in interpreting the August 2017 CBA's provisions. Cf. Joy v. Kaiser Alum. & Chem. Corp., 62 Wn. App. 909, 816 P.2d 90 (1991) (court affirmed dismissal of plaintiff's tort claim against employer because claim required court to interpret employer's promises to plaintiff in CBA). The trial court erred in concluding otherwise.

C. Glacier's Misrepresentation and Tortious Interference Claims

Although the trial court erred in holding that Glacier's claims for misrepresentation were preempted by the LMRA, it also addressed the merits of these claims, concluding Glacier failed to present a genuine issue of material fact. We conclude the trial court correctly dismissed these claims on their merits but do so on alterative grounds. See Jenson v. Scribner, 57 Wn. App. 478, 480, 789 P.2d 306 (1990) (appellate court can affirm the dismissal claims on any ground established by the pleadings and supported by the evidence).

1. Fraudulent and Negligent Misrepresentation

A claim of fraudulent misrepresentation requires proof of a representation of an existing fact. Cornerstone Equip. Leasing, Inc. v. MacLeod, 159 Wn. App.

899, 905, 247 P.3d 790 (2011).[10]  It is well established in Washington that a promise of future performance is not an actionable representation of existing fact required for a fraud claim.  Adams v. King County, 164 Wn.2d 640, 662, 192 P.3d 891 (2008) ("a false promise does not constitute the representation of existing fact").  A false representation of presently existing fact is also a prerequisite to a negligent misrepresentation claim.  Donald B. Murphy Contractors, Inc. v. King County, 112 Wn. App. 192, 197, 49 P.3d 912 (2002).

Hicks's alleged statement that "the drivers will respond to dispatch" is a promise that the drivers will do something in the future.  As such, it is not an actionable statement of existing fact.  Summary judgment dismissal of Glacier's fraudulent and negligent misrepresentation claim was appropriate on this alternative ground.

### 2.  Tortious Interference

Glacier next maintains the trial court erred in dismissing its claim that the Union tortiously interfered with its performance of the GLY contract.  Glacier argued below that the Union interfered with its performance of its contractual obligations to GLY by falsely stating that drivers would show up for the mat pour.  The trial court concluded that there was no evidence that Hicks's statement "intended to breach or terminate Glacier's relationship with GLY" or that the alleged

---

[10] The nine elements of fraud are

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

Stieneke v. Russi, 145 Wn. App. 544, 563, 190 P.3d 60 (2008).

representation caused Glacier's injury because the drivers had the discretion to refuse to work under the August 2017 CBA. While we agree with Glacier that the trial court applied an incorrect legal standard, we nevertheless affirm the trial court's conclusion that Glacier's evidence failed to establish a question of fact on the element of proximate cause.

The trial court relied on Brown v. Safeway Stores, Inc., 94 Wn.2d 359, 374, 617 P.2d 704 (1980), for the proposition that Glacier had to prove that the Union caused a breach or termination of Glacier's business relationship or contract with GLY. While Brown correctly set out the necessary elements of a claim under *Restatement (Second) Torts* Section 766 (Am. Law Inst. 1979) (tortious interference causing a breach of contract with a third person), that case did not address a claim arising under *Restatement (Second) Torts* Section 766A (tortious interference preventing plaintiff from performing under a contract with a third person). Section 766A provides "One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for pecuniary loss resulting to him." Washington recognizes claims under section 766A. Eserhut v. Heister, 52 Wn. App. 515, 518, 762 P.2d 6 (1988); see also Pac. Typesetting Co. v. Int'l Typographical Union, 125 Wash. 273, 216 P. 358 (1923) (union coerced employees to strike to render it impossible for employer to complete printing contract with other companies). Under section 766A, Glacier did not have to prove the Union caused it to breach its contract with GLY or that GLY terminated the contract with Glacier as a result of the mat pour cancellation. It only had to

establish that the Union used improper means to make Glacier's performance of its contract with GLY more expensive or burdensome. Glacier presented evidence to establish this element of its tortious interference claim.

However, the trial court correctly concluded that Glacier failed to establish that the Union, through Hicks's statement, proximately caused the losses associated with canceling the mat pour on August 19. Although causation is usually an issue for the jury, where inferences from the facts are remote or unreasonable, factual causation is not established as a matter of law. Sea-Pac Co. v. United Food & Commercial Workers Local Union 44, 103 Wn.2d 800, 805, 699 P.2d 217 (1985) (affirmed dismissal of tortious interference claim). The undisputed evidence in this case showed that Glacier's truck drivers had no contractual obligation to show up for work that night, regardless of any instruction to do so from Hicks.

Although the August 2017 CBA gave Glacier the exclusive power to make work assignments, it was required to follow a specific procedure for doing so. Article 3.02 of the August 2017 CBA provided that Glacier was required to advise drivers by noon on Thursday before the weekend whenever it anticipated weekend work. CP 569, 1677. This notice permitted drivers to volunteer for such jobs. CP 1678. Article 3.02 gave Glacier two options for enlisting volunteers. First, it could offer the weekend job by seniority to employees paid for 32 or fewer hours that week. CP 569, 1678. Or if it could not recruit enough volunteers through this process, it could offer the job by seniority to employees paid that week for more than 32 hours. Id. If, by 5 p.m. on Friday, Glacier did not obtain a sufficient number

of volunteers, it could force a driver to work by using a third option of assigning work by inverse seniority to employees. CP 569, 1679.

But the mandatory assignment process in Article 3.02 remained subject to Article 3.10, which provides that the employer must notify drivers by 9 a.m. each workday if they would be scheduled for work some time that day. CP 570, 1679. If work became available after 9 a.m., the employer "may call drivers" but it could not discipline any employee who declined to report for work. Drivers have no contractual obligation to take dispatch calls after 9:00 a.m. and, if they do, they may accept or decline work without repercussion. CP 570, 1679. Finally, any driver who is scheduled to begin work between 12:00 a.m. and 4:59 a.m. must be given at least 10 hours' notice. CP 570, 1679.

It was undisputed that Glacier did not notify drivers of the midnight mat pour by noon on Thursday, August 17, or by 9:00 a.m. on Friday, August 18. Glacier also called drivers by seniority, rather than by inverse seniority. CP 1680. And because Glacier did not begin contacting drivers until approximately 1:30 p.m. on Friday afternoon, for report times beginning that night at 12:30 a.m., many did not receive the mandatory 10 hours' notice. CP 1703-07. Thus, under the unambiguous terms of the August 2017 CBA, the workers had no obligation to perform work on the night of August 18 or the early morning of August 19.

Glacier concedes the August 2017 CBA did not require any of its drivers to report to work for the mat pour. Glacier argues, however, that the terms of the August 2017 CBA are irrelevant because the Union representative promised the workers would come to work. Even if we accept this assertion as true, there is nothing in this record to support the notion that the Union had any authority or

ability to order drivers to work when the August 2017 CBA did not require them to do so. Even had Hicks instructed the drivers to show up to work that night, Glacier has no evidence the drivers had any duty to comply with such an instruction. Under these circumstances, no reasonable jury could conclude that Hicks's statement caused Glacier's losses. For this reason, summary judgment dismissal of the tortious interference claim was appropriate.

CONCLUSION

We reverse the dismissal of Glacier's property destruction claims arising out of the August 11 work stoppage. Glacier alleged conduct by the Union—sabotage and the intentional destruction of property—that the NLRB has clearly held is not protected under section 7 of the NLRA. We affirm the dismissal of the tort claims arising out of the August 19 mat pour.

Affirmed in part, reversed in part.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._          _Dwyer, J._